TIGER STADIUM FAN CLUB, INC v GOVERNOR

Docket No. 194133. Submitted June 6, 1996, at Lansing. Decided July 5, 1996, at 9:20 A.M. Leave to appeal denied, 453 Mich 865.

State Senator George Z. Hart and Tiger Stadium Fan Club, Inc., brought an action in the Ingham Circuit Court against Governor John Engler and the Michigan Strategic Fund, seeking declaratory and injunctive relief from a grant of Michigan Strategic Fund monies by the Center for Community Redevelopment, a creation of the Michigan Strategic Fund Board of Directors, to the Detroit Downtown Development Authority for public infrastructure improvements related to the construction of a new stadium for the Detroit Tigers baseball team. The grant included monies paid into the Michigan Strategic Fund by tribes of American Indians under the terms of a consent judgment entered by a federal district court in an action brought by the tribes against the Governor. In their action, the tribes had sought to compel the Governor to conclude compacts with the tribes to allow them to operate casinos on tribal lands, as provided under the Indian Gaming Regulatory Act, 25 USC 2701 *et seq.* The consent judgment provided that once the Governor concluded compacts with the tribes, the tribes would pay a percentage of gaming revenues into the Michigan Strategic Fund. The compacts were ratified by the Legislature. The plaintiffs alleged that monies paid by the tribes into the Michigan Strategic Fund were state funds within the meaning of the Appropriations Clause of the state constitution, Const 1963, art 9, § 17, that could not be directed to or spent by the Michigan Strategic Fund without an appropriation by the Legislature, that the expenditure of such funds without legislative approval would violate the Separation of Powers Clause of the state constitution, Const 1963, art 3, § 2, and that the Michigan Strategic Fund lacked authority to create the Center for Community Redevelopment, through which Michigan Strategic Fund monies were granted to the Detroit Downtown Development Authority. The court, James R. Giddings, J., allowed the Detroit Downtown Development Authority to intervene as a defendant and granted summary disposition for the defendants and dismissed the complaint. Tiger Stadium Fan Club, Inc., appealed.

The Court of Appeals *held*:

1. The gaming revenues paid by the tribes into the Michigan Strategic Fund, which is authorized by statute to receive and accept grants, gifts, and other aid, are public funds that are not subject to appropriation. They are gratuitous payments negotiated by the Governor and designated for a specific purpose and their payment into and disbursement from the Michigan Strategic Fund without an act of the Legislature does not violate the Appropriations Clause. Because the gaming revenues paid by the tribes are not subject to legislative appropriation, the Separation of Powers Clause was not violated when the Governor negotiated the settlement that required that payment be made to the Michigan Strategic Fund and will not be violated when the gaming revenues are disbursed from the Michigan Strategic Fund without legislative action.

2. The Michigan Strategic Fund did not lack authority to create the Center for Community Redevelopment, through which Michigan Strategic Fund monies, including the Indian gaming revenues, were granted to the Detroit Downtown Development Authority. The Michigan Strategic Fund Act confers broad authority on the Michigan Strategic Fund to create and operate centers, accounts, and funds as required or permitted by law for the use and disbursement of assets of the fund. MCL 125.2007(q); MSA 3.541(207)(q). The contention by Tiger Stadium Fan Club, Inc., that the centers contemplated by § 7(q) are limited to those established in chapters 3 through 8 of the Michigan Strategic Fund Act is erroneous.

Affirmed.

1. INDIANS — INDIAN GAMING REGULATORY ACT — GAMING REVENUES PAID INTO MICHIGAN STRATEGIC FUND — CONSTITUTIONAL LAW.

Payments by Indian tribes into the Michigan Strategic Fund of a percentage of gaming revenues from casinos on tribal lands as provided in a negotiated settlement of an action by the tribes under the Indian Gaming Regulatory Act to compel the Governor to conclude a compact with the tribes concerning gaming are gratuitous; the payment into and disbursement of such monies from the Michigan Strategic Fund are not subject to legislative appropriation under the state constitution and do not violate the Separation of Powers Clause of the state constitution when payments and disbursements are made without legislative action (25 USC 2071 *et seq.*; MCL 125.2001 *et seq.*; MSA 3.541[201] *et seq.*).

2. STATUTES — MICHIGAN STRATEGIC FUND ACT — MICHIGAN STRATEGIC FUND.

The Michigan Strategic Fund Act confers broad authority on the Michigan Strategic Fund to create and operate centers, accounts, and funds as required or permitted by law for the use and disbursement of assets of the fund (MCL 125.2007[q]; MSA 3.541[207][q]).

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Robert W. Southard*), for Tiger Stadium Fan Club, Inc.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Terrence P. Grady* and *Steven D. Hughey*, Assistant Attorneys General, for Governor John Engler and Michigan Strategic Fund.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Peter H. Ellsworth* and *Jeffery V. Stuckey*), for City of Detroit Downtown Development Authority.

Before: MCDONALD, P.J., and WHITE and P. J. CONLIN,* JJ.

WHITE, J. Plaintiff Tiger Stadium Fan Club, Inc., appeals from the circuit court's order denying its motion for summary disposition, granting motions for summary disposition by defendants Governor John Engler and the Michigan Strategic Fund and intervening defendant the City of Detroit Downtown Development Authority (DDA), and dismissing the complaint with prejudice. We affirm.

The questions presented are (1) whether funds generated under a consent judgment entered into by Governor Engler and several Native American tribes in settlement of an action brought under the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq.*, and deposited into the Michigan Strategic Fund (MSF) pursuant to the terms of the settlement agreement, are, under the Appropriations Clause, Const 1963, art 9, § 17, and the Separation of Powers Clause, Const 1963, art 3, § 2, subject to the Legislature's power of appropriation, and (2) whether the MSF has the

---

* Circuit judge, sitting on the Court of Appeals by assignment.

authority to distribute those funds in the form of a grant to the DDA for use in the construction of a stadium for the Detroit Tigers baseball team.

We conclude that the revenues involved are not subject to the Appropriations Clause, that the Governor did not violate the Separation of Powers Clause, and that the MSF had the authority to make the grant to the DDA for the designated purposes.

I

The MSF is a public corporation established by the Michigan Strategic Fund Act, 1984 PA 270, as amended, MCL 125.2001 *et seq.*; MSA 3.541(201) *et seq.*

The IGRA is a federal statute that regulates the circumstances and procedures under which gaming is conducted on tribal lands. The IGRA allows certain gaming activities to occur only pursuant to a compact negotiated between the tribes and the state in which the tribal lands are located. When requested to do so by a tribe, a state must negotiate in good faith to enter into a compact. The IGRA provides that if a state fails to negotiate or fails to negotiate in good faith, a tribe seeking a compact may bring suit in federal court to enforce the state's obligation to negotiate.[1]

---

[1] 25 USC 2710(d)(3)(A) provides that an Indian tribe having jurisdiction over lands where class III gaming activities are to be conducted shall request the state in which such lands are located to enter into negotiations for the purpose of entering into a compact governing the conduct of the gaming activities. Upon receiving the request, the state is obligated to negotiate with the tribe in good faith. Subsection d(7) provides that a tribe may initiate an action in the United States district court when a state fails to enter into negotiations, or fails to negotiate in good faith. The statute provides that if the court concludes that the state did not negotiate in good faith, the court shall order that a compact be concluded within sixty days. If such a compact is not concluded, the parties must submit proposals to a court-appointed mediator. The mediator must choose a compact

In 1990, several tribes filed suit under the IGRA against the State of Michigan in the United States District Court for the Western District of Michigan. In 1992, the federal court dismissed the action on the ground that the IGRA's grant of federal jurisdiction violated the state's sovereign immunity under the Eleventh Amendment. US Const, Am XI. *Sault Ste Marie Tribe of Chippewa Indians v Michigan*, 800 F Supp 1484 (WD Mich, 1992). The tribes then filed a first amended complaint naming Governor Engler as the sole defendant. The suit sought an order compelling Governor Engler to conclude a compact.

Before trial, the parties stipulated to the entry of a consent judgment. The consent judgment provided that the tribes would make semiannual payments of eight percent of certain gaming revenues to the MSF as long as a compact remained in effect, and as long as the tribes hold the exclusive right to conduct specified gaming activities in the state. In addition, the judgment provided that the tribes would make payments of two percent of certain gaming revenues to local units of government in the immediate vicinity of each tribal casino. The consent judgment was to become effective upon execution of compacts between the tribes and the Governor and approval of the compacts by resolution of the Legislature. The federal court entered the consent judgment on August

---

from the last best offers submitted. If the state fails to consent to the proposed compact, the Secretary of the Interior is notified and the Secretary then prescribes procedures under which class III gaming may be conducted. However, in *Seminole Tribe of Florida v Florida*, 517 US ___; 116 S Ct 1114; 134 L Ed 2d 252 (1996), the provision of the statute authorizing a tribe to bring an unconsented-to action in federal court against a state to compel the state to negotiate in good faith was held to abrogate the states' sovereign immunity in violation of the Eleventh Amendment.

20, 1993, and on the same day Governor Engler entered into compacts with the various tribes.

In September 1993, the Legislature approved the compacts by resolution. The resolution did not specifically mention the consent judgment or the payments to the MSF. The legislative history, however, makes clear that the Legislature was aware of the terms of the agreement, including that it provided for regular payments directly to the MSF. See n 5, *post* at 455.

In March 1994, the tribes began making payments to the MSF. The funds were deposited by the MSF into an account designated as the Indian Casino Account. As of September 21, 1995, the MSF had received $25,737,614.26 from the tribes, and those funds had generated $360,936.92 in interest.

On September 20, 1995, the Board of Directors of the MSF adopted a resolution creating the Center for Community Redevelopment (CCR), pursuant to MCL 125.2007(q); MSA 3.541(207)(q), to "make grants to municipalities to assist in the financing of public infrastructure including land acquisition and site development for utility extensions, highway and road improvements, and other public improvements which are related to a specific identifiable project." Resolution 1995-154, ¶ 3, p 2. The creation of the CCR enabled the MSF to consider the DDA's grant request. The MSF then adopted a resolution agreeing to grant assistance to the DDA in an amount not to exceed $55 million.

On September 21, 1995, the MSF segregated $55,668,262.15, in the form of cash and securities, for the benefit of the DDA, including $26,098,551.18 taken from the Indian Casino Account. On September 28, 1995, the MSF and the DDA executed a grant agreement

providing funds to assist with costs associated with infrastructure, land development, and site development necessary to the construction of a new stadium for the Detroit Tigers. The MSF funds are part of a financing package totaling $230 million. The remaining funds are to come from the DDA itself and from the Detroit Tigers.

On November 2, 1995, State Senator George Z. Hart and the Tiger Stadium Fan Club filed this action seeking declaratory and injunctive relief, asserting that the gaming revenues are state funds within the meaning of the Appropriations Clause of the state constitution and as such cannot be directed to or spent by the MSF without an appropriation by the Legislature, and that efforts to spend the funds without a legislative appropriation violated the Separation of Powers Clause of the state constitution. Plaintiffs also asserted that the MSF lacked the statutory authority to make a grant to the DDA. The DDA intervened as a defendant.

All parties filed motions for summary disposition. Plaintiffs argued that because the gaming revenues arise from the actions and operations of the government and are payments made in exchange for government concessions, they constitute state funds under *Pokorny v Wayne Co*, 322 Mich 10, 15; 33 NW2d 641 (1948), and cannot be spent except pursuant to a legislative appropriation; that the gaming revenues do not qualify as custodial funds, i.e., funds received by a third party and held for an already-determined spending purpose, because they were obtained by Governor Engler during the exercise of his official duties and the Governor determined their use; and that the Governor's attempt to raise and spend revenue absent a legislative appropriation violates the Separation of

Powers Clause. Plaintiffs further asserted that the MSF had no statutory authority to make a grant to the DDA because the CCR was not a center created by the MSF Act.

Defendants argued that plaintiffs' claims are barred by laches; that the Governor acted within his authority; that the consent judgment obligated the state to nothing, and the gaming revenues obtained pursuant to that judgment do not constitute state funds; that the consent judgment obligated the tribes to pay the revenues directly to the MSF, which is entitled to receive funds by gifts, grants, and loans, MCL 125.2007(b); MSA 3.541(207)(b), and the receipt of the gaming revenues by the MSF does not transform those revenues into state funds, *Advisory Opinion re Constitutionality of PA 1966, No 346*, 380 Mich 554; 158 NW2d 416 (1968); and that the Legislature ratified the Governor's actions. Further, defendants asserted that the MSF has the statutory authority to create centers and make grants.

The trial court denied plaintiffs' motion and granted defendants' motions, concluding that the funds received by the MSF pursuant to the consent judgment are not state funds because the gaming revenues never came under the control of the Legislature and did not take on the character of state funds simply because they were paid to the MSF. The court noted that pursuant to *Advisory Opinion, supra*, funds that pass into the hands of a quasi corporation do not automatically become state funds subject to control by the Legislature, and concluded that to hold otherwise would undermine, if not destroy, the ability of the MSF to manage its affairs. The court rejected the argument that Governor Engler's exercise of his

authority in settling the federal litigation transformed the gaming revenues into state funds, concluding that the litigation grew out of the IGRA, which allows the state only a limited role, and that in settling the lawsuit, Governor Engler made no concessions on behalf of the state, although the tribes agreed to pay a percentage of gaming revenues to the MSF. Finally, the court found that the MSF Act contains a broad grant of authority that allowed the MSF board of directors to take the steps necessary to make a grant to the DDA.

The Fan Club now appeals from the circuit court's order denying its motion for summary disposition, granting defendants' and intervening defendant's motions, and dismissing the complaint with prejudice.

II

The Appropriations Clause, Const 1963, art 9, § 17, provides:

> No money shall be paid out of the state treasury except in pursuance of appropriations made by law.

The Separation of Powers Clause, Const 1963, art 3, § 2, provides:

> The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

All agree that notwithstanding the language of art 9, § 17, it is of no consequence that the funds were never placed in the state treasury or that they were remitted directly to a public corporation. The location of the funds is irrelevant; the question is whether the

character of the funds and the manner in which they were obtained makes them state funds subject to the Appropriations Clause.

The Fan Club argues that the revenues at issue are state funds because they arise out of litigation against the state to enforce the state's obligation to negotiate, notwithstanding that in the action that was settled Governor Engler was the nominal defendant, and not the state. The Fan Club asserts that the IGRA does not mandate the payment of revenues under a compact and the state made concessions to the tribes to obtain the revenues because, while a compact would have been imposed had the parties been unable to reach an agreement, the Governor chose to terminate the suit by agreeing to a settlement even though he could have engaged in the mediation process or pursued the position that the IGRA enforcement scheme is unconstitutional as a violation of Michigan's sovereign immunity under the Eleventh Amendment. (See n 1 *ante* at 442-443.) The Fan Club further asserts that while custodial funds held in trust may be spent without an appropriation, *Pokorny, supra* at 14-15, the gaming revenues are not custodial funds because the revenues, which resulted from state negotiations, had no required use, and the Governor, without input from others, determined the amount of the revenues and the use to which they would be put. Cf. *Colorado General Assembly v Lamm*, 700 P2d 508 (Colo, 1985). The Fan Club argues that the payment of the revenues to the MSF, a corporation, does not mean that the revenues are not state funds, because the authority of a corporation to spend money does not change the character of the funds received, and any reliance on *Advisory Opinion, supra*, is misplaced because that

case stands for the proposition that funds generated by the quasi corporation itself are not state funds, while here the gaming revenues were not generated by the MSF. Finally, the Fan Club asserts that the constitution requires that the decision how gaming revenues are spent be made by the people of this state through the Legislature.

The Fan Club's contention that the gaming revenues are subject to appropriation is based on further assertions that the funds were generated by governmental operations and were obtained in exchange for concessions by the state. In *Pokorny, supra,* the Supreme Court addressed the question whether unclaimed alimony payments deposited with the Wayne County Friend of the Court were public funds, and defined such funds as "those funds which are raised by a governmental unit or agency for the conduct of government and for governmental purposes." 322 Mich 15. The Fan Club relies on this definition. We conclude, however, that this reliance is misplaced.

In the instant case, the revenues are generated by the tribes. The revenues are not paid as a tax or a fee, or pursuant to a legislative act. While the revenues are paid to a public corporation as a result of the Governor's negotiation of a settlement of the federal litigation, the mere act of settling a lawsuit involving the state's obligation to negotiate does not automatically render the revenues subject to appropriation; the character of the revenues must still be considered. While a lawsuit was involved, the state did not concede or give away anything in the settlement of the suit. The revenues at issue do not result from the sale, relinquishment, waste, or damage of state assets. They are not paid as rents or royalties collected for

the extraction of nonrenewable resources from state-owned lands. MCL 324.1902; MSA 13A.1902; Const 1963, art 9, § 35. The revenues are not designated as a gift or grant to the state. MCL 21.161; MSA 3.671. The revenues are not received as payment of debts or as penalties. MCL 14.33; MSA 3.186.

The gaming revenues were not generated in settlement of obligations of, or to, the state. Had the federal litigation continued, the conclusion of compacts would have been the inevitable result. While the settlement did permit the tribes to begin certain gaming operations sooner, and without having to proceed through mediation, this is not the equivalent of state concessions. With the exception of forgoing the constitutional challenge to the IGRA, the state conceded nothing by settling the litigation.[2] While compacts would have been the inevitable result of continued litigation, the resulting compacts would not have contained provisions requiring the tribes to pay a portion of certain gaming revenues to the MSF. The IGRA does not mandate that tribes pay a percentage of gaming revenues to the state, and, indeed, expressly forbids a state from exacting fees in excess of those necessary

---

[2] In *Seminole Tribe, supra*, the Supreme Court held that Congress could not constitutionally grant the federal courts jurisdiction over a state that does not consent to be sued. Should a state determine not to assert its sovereign immunity, the case may proceed. Footnote 18 of the opinion states, "We do not here consider, and express no opinion upon, that portion of the decision below that provides a substitute remedy for a tribe bringing suit." The Eleventh Circuit Court of Appeals, 11 F3d 1016 (1994), held that if a state fails to negotiate in good faith and will not consent to suit, the tribe may notify the Secretary of the Interior of the failure to negotiate a compact, pursuant to 25 USC 2710(d)(7)(B)(vii), and the Secretary may prescribe procedures for the conduct of gaming activities. Thus, it may be that the consent to be sued is effectively no concession at all. Further, the IGRA does not require that a suit be filed in order for a tribe and a state to initiate negotiations.

to offset regulatory expenses or imposing taxes beyond those generally imposed for comparable activities. 25 USC 2710(d)(3)(C)(iii), (iv), (4). Here the compacts provide for the payment of fees permitted under the IGRA and that those fees be paid to the state.[3] The additional amounts paid to the MSF are funds that the state would have had no right to demand. In fact, it appears that the Governor identified an opportunity to secure revenues to which the state was not entitled, except by virtue of the negotiated settlement, when he entered into an agreement that provided for the gratuitous payment of eight percent of certain gaming revenues to the MSF as long as the tribes' right to conduct these activities remains exclusive. That portion of the consent judgment stating that the tribes are obligated to make payments to the MSF only as long as the compacts remain in effect and only as long as the tribes retain the exclusive right to conduct certain gaming activities is not a concession. The state gave nothing in exchange for the payments. The tribes' ability to conduct the gaming activities is a matter of right, not grace. If the gaming

---

[3] Section 4 of the compacts is entitled Regulation of Class III Gaming. Subsection K of § 4 provides for the administration and enforcement of the regulatory requirements. Item 5 of subsection K provides:

> The Tribe shall reimburse the State for the actual costs the State incurs in carrying out any functions authorized by the terms of this Compact, in an amount not to exceed twenty-five thousand dollars ($25,000.00) per annum. . . . Within sixty (60) days after each fiscal year in which this Compact is in effect, the State shall submit to the Tribe an accounting of actual costs incurred in carrying out any functions authorized by the terms of this Compact. Any amount of said twenty-five thousand ($25,000.00) not expended by the State on said actual costs shall be returned to the Tribe by the State within sixty (60) days after the fiscal year or treated as a prepayment of the Tribe's obligation during the subsequent fiscal year.

activities are made legal under other circumstances, the tribes will still retain the right to conduct these activities.

We thus conclude that the revenues involved are public funds not subject to appropriation. The Governor's negotiation of the settlement agreement providing for payments to the MSF is akin to his procuring a grant of federal or corporate funds for a specific purpose. In such circumstances, the Governor, acting as a representative of the state, convinces the grant-making authority that it is in its best interest to donate funds to the state for a particular purpose. That the Governor might have sought the funds for a different or broader purpose is of no moment. The terms of the grant or gift control. In this regard, MCL 21.161; MSA 3.671 concerning grants, gifts, and other donations to the state, is inapplicable. The payments here are gratuitous payments specifically designated for the MSF, not for the state. The MSF is expressly authorized by statute to accept gifts, grants, loans, and other aids.[4] The state gave up nothing; the tribes

---

[4] This factor distinguishes the instant circumstances from those involved in OAG 1943-1944, No 24129, p 22 (July 20, 1942). There the question was whether an intended bequest to the Ypsilanti State Hospital should be made to the state or directly to the State Hospital Commission. The Attorney General concluded that because the statutes relating to the State Hospital Commission did not provide the commission authority to accept gifts and bequests, and other statutes provided that all commissions of state government shall be wholly financed and maintained by specific appropriations by the Legislature, 1929 CL 220, and that any bequest to the state shall be received by the Governor and reported to the Legislature, 1929 CL 341 (now MCL 21.161; MSA 3.671), the bequest should be made to the state, to be used for the designated purpose. In contrast, the MSF is authorized to accept grants and gifts directly. Thus, the revenues having been designated for the MSF in the settlement agreement, there is no requirement that they be paid or reported to the Legislature.

In OAG 1935-1936, No 22, p 73 (February 26, 1935), the question was whether a bequest to an institution under the jurisdiction of the State Hos-

perceived that it was in their interest to make, in effect, a continuing grant of eight percent of certain revenues as long as the advantageous status quo—exclusive rights to conduct certain gaming activities—is maintained. The negotiated settlement agreement provides for the payment of those revenues to a fund that is authorized to disburse funds to promote economic development throughout the state, including in areas that might themselves be interested in seeing certain local gaming activity, perhaps persuading the citizens and leaders of those areas that there are benefits to be gained from leaving the exclusive right to conduct this gaming activity with the tribes. In short, the payments were not procured by the Governor in exchange for concessions. Rather, they are the tribes' contribution to the MSF to create an incentive to preserve the status quo. The Legislature and the Governor, however, are in no way obligated to preserve the status quo.

We thus conclude that the revenues involved are public funds not subject to appropriation in that they are gratuitous payments negotiated by the Governor

---

pital Commission was to be earmarked for the institution or was revenue that should be received into the state's general fund. There, the Attorney General concluded that the final language of 1919 PA 98, § 9, the same statute relied on in OAG 1943-1944, No 24129 (1919 CL 220), which states that nothing in the statute (regarding the financing of institutions)˙ shall be construed "to prevent any institution . . . or commission from accepting gifts, grants, bequests or any assistance whatsoever from private sources . . . in the furtherance of [its] purposes" and settled law relating to charitable dispositions required that the money be expended by the institution as it deems advisable for the furtherance of its purposes. The opinion discusses the responsibility of the head of the State Hospital Commission to publicize the institution and attract donations and concludes that the law, including 1901 PA 145 § 1 (now MCL 21.161; MSA 3.671), does not circumscribe the capacity to accept gifts or remove the incentive to invite such gifts by directing the money to the state's general fund.

and designated for a specific purpose and that the payment of those revenues to, and their disbursement from, the MSF without an act of the Legislature does not violate the Appropriations Clause.

We further conclude that the Governor did not violate the Separation of Powers Clause in negotiating and effectuating the settlement. The Fan Club does not assert that the Governor did not have the authority to settle the federal litigation. Rather, it asserts, essentially, that the Governor lacked authority to agree that the revenues would be paid directly to the MSF, or, alternatively, that the MSF has no authority to disburse the revenues without a legislative appropriation, because to conclude otherwise violates the Separation of Powers Clause by permitting the Governor to usurp the Legislature's exclusive power to raise revenues and determine expenditures. We conclude, however, that because the revenues are not subject to the Appropriations Clause and are gratuitous payments for a designated purpose, no appropriation was necessary and the Governor did not usurp the Legislature's power in entering into an agreement providing for the payment of the revenues directly to the MSF and that the Separation of Powers Clause does not require legislative action before the revenues may be spent by the MSF. It has long been Michigan law that courts should not interfere with the actions of the Governor when he acts pursuant to constitutional or statutory authority. See *Sutherland v Governor*, 29 Mich 320, 328 (1874). We also observe that the legislative history clearly indicates that the Legislature was aware that the consent judgment provided that the

gaming revenues were to be paid directly to the MSF.[5]
Thus, the Governor constitutionally caused the

---

[5] In House Concurrent Resolution No 439, the House of Representatives concurred in the Tribal-State Gaming Compacts and resolved that copies of the resolution be transmitted to the Governor, the representatives of the tribes, and the Secretary of the Interior.

When considered by the Senate, the resolution engendered considerable discussion. It was first asserted by Senator John Kelly that "the Michigan Constitution provides that all legislative powers are vested in the Senate and the House and there is no authorization to the Governor by statute or constitutional provision to negotiate this compact." 1993 Journal of the Senate 2473. Senator Kelly questioned whether the compacts would have the force of law, and if so, whether the general procedures for enacting a law should not apply. He also asserted that the Governor had not been authorized by the Legislature to engage in compacts and that the procedure being employed to ratify the compacts violates the constitution. Senator Kelly further addressed the Senate:

> So, what we have is a piece of paper being delivered to this body from the House that is classified as a ratification document for a compact which violates all of the aforementioned sections of the Constitution . . . . You are being asked to participate in this process in a way that doesn't even bring before you the exact wording of the compact. I have made copies available to everyone on the floor. I've tried to make copies of the two other documents, the consent judgment and the stipulation for entry of consent judgment, which have provisions which have been submitted to a federal court so that you can understand that all three of these documents must be read together to get a full understanding of what we are being asked to give our approval to. [1993 Journal of the Senate 2474.]

Senator Kelly also proposed an amendment of the resolution that would have made concurrence in the compact conditional on the modification of the negotiated stipulation to provide that the gaming revenues be allocated towards supporting K-12 education. The proposed amendment was defeated 29 to 7.

Senator Kelly continued, further questioning the propriety of the procedure employed, the Governor's constitutional authority to negotiate the compact, and the wisdom of paying the revenues to the MSF, rather than to support education. Senator Gilbert DiNello then expressed his concerns regarding the funds, stating:

> I do not want any money that is generated from this endeavor to be used for the building of a Tiger Stadium or more importantly any infrastructure that goes along with such a building, wherever it is located in the city of Detroit. That's my concern. I do believe that any endeavor or any development that occurs on behalf of the

equivalent of a grant to be made, with the approval of the Legislature, to a state corporation authorized by the Legislature to receive and accept grants, gifts, and other aids.

III

The Fan Club next argues that the MSF lacked the statutory authority to make a grant to the DDA. On September 20, 1995, the Board of Directors of the MSF adopted a resolution creating the Center for Community Redevelopment pursuant to MCL 125.2007(q); MSA 3.541(207)(q), which grants the MSF the power to "create and operate centers, accounts, and funds as required or permitted by law for the use and disbursement of assets of the fund." The Fan Club contends that the six centers "required" by law are those created in chapters 3 through 8 of the MSF Act, that § 7(q) does not authorize the creation of new centers, and that because the MSF had no power to create a

---

Tiger Company or the Detroit Tigers should occur on their own behalf. [1993 Journal of the Senate 2478.]

A substitute resolution was withdrawn, and the Senate then approved House Concurrent Resolution No 439 by a vote of 23 to 13.

It is thus clear, first, that the Senate was aware of the terms of the compacts and consent judgment, including the provision for the payment of eight percent of certain gaming revenues directly to the MSF, and, second, that the Senate rejected challenges to the Governor's constitutional authority to negotiate the compacts and adopted the concurrent resolution with the intention of ratifying and approving the compacts and settlement agreement as negotiated by the Governor. We recognize that it is a separate question whether the concurrent resolution would constitute sufficient legislative action if the revenues were determined to be subject to appropriation, one we do not address because our decision that the revenues are not subject to appropriation makes it unnecessary to do so. Putting aside Appropriations Clause considerations, and having in mind that the Legislature ratified and approved the Governor's actions and the resulting compacts and consent judgment, we reject the argument that the Governor usurped the powers of the Legislature.

center whose purpose is to make grants to municipalities, the MSF had no authority to make a grant of any size to the DDA.

We disagree. The Legislature conferred broad authority on the MSF. MCL 125.2007; MSA 3.541(207) provides:

> The fund shall have the powers necessary or convenient to carry out and effectuate the purposes, objectives, and provisions of this act, the purposes and objectives of the fund, . . . including but not limited to the power to:
>
> \*       \*       \*
>
> (q) To create and operate centers, accounts, and funds as required or permitted by law for the use and disbursement of assets of the fund.

We reject the argument that the centers contemplated by §7(q) are only those established in chapters 3 through 8, and that no others may be created. Section 7(q) specifically grants the MSF the power to both *create* and operate centers, and employs the phrase "required or *permitted* by law." Further, chapters 3 through 8 repeatedly state that the MSF shall "*establish* and operate" the enumerated centers, while § 7(q) employs the phrase "*create* and operate." When construing a statute, a court should presume that every word in the statute has some meaning. A construction that renders some part of the statute surplusage or nugatory should be avoided. To the extent possible, effect should be given to every word in the statute. *Indenbaum v Michigan Bd of Medicine (After Remand)*, 213 Mich App 263, 272; 539 NW2d 574 (1995). Here, a construction that accepts the argument that no other centers can be created renders the language in § 7(q) referring to the creation of

centers nugatory. We reject this argument and conclude that the creation of the CCR was a valid exercise of statutory power by the MSF. The creation of the CCR was "permitted by law" because the purposes of the CCR are within the purposes and objectives of the act. MCL 125.2007; MSA 3.541(207).

IV

Defendants maintained below and continue to maintain that this action is barred by the doctrine of laches. Our decision to affirm on the merits makes it unnecessary to reach this issue.

Affirmed.