# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued September 14, 2017          Decided November 21, 2017
                                                        Reissued March 6, 2018

No. 16-5270

DETROIT INTERNATIONAL BRIDGE COMPANY, A MICHIGAN
CORPORATION AND CANADIAN TRANSIT COMPANY, A
CANADIAN SPECIAL ACT CORPORATION,
APPELLANTS

v.

GOVERNMENT OF CANADA, ET AL.,
APPELLEES

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00476)

―――――

*Hamish Hume* argued the cause and filed the briefs for appellants.

*Robert J. Lundman*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *J. David Gunter II*, Trial Attorney. *Matt Littleton*, Trial Attorney, entered an appearance.

*Joshua O. Booth*, Assistant Attorney General, Office of the Attorney General for the State of Michigan, was on the brief

for *amicus curiae* Michigan Governor Richard D. Snyder in support of defendants-appellees.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Ambassador Bridge is the only bridge spanning the Detroit River between Detroit, Michigan and Windsor, Canada. It has been in operation since 1929 and is currently owned and operated by the Canadian Transit Company, which is wholly owned by the Detroit International Bridge Company (collectively "the Company"). The Company decided to build a new span ("the Twin Span") in order to allow maintenance of the aging structure of the old span. This appeal involves the Company's effort to have declared invalid a Crossing Agreement entered into in 2012 by Michigan State officials and the Government of Canada to build another bridge, within two miles of the Ambassador Bridge. The Company appeals the dismissal of four counts of its complaint and the grant of summary judgment on one count, raising statutory challenges and one constitutional objection. For the following reasons, we conclude none of the challenges are persuasive and, accordingly, we affirm.

## I.

The 1909 Treaty Between the United States and Great Britain Relating to Boundary Waters Between the United States and Canada required authorization by "special agreement" prior to the construction of any bridge over the boundary waters between Canada and the United States. 36 Stat. 2448 (signed Jan. 11, 1909). In 1921, Congress authorized the Company's predecessor to build the

Ambassador Bridge over the Detroit River. *See* Act of Mar. 4, 1921, 41 Stat. 1439. In 1972, Congress enacted a general statute, the International Bridge Act ("IBA"), authorizing the construction of international bridges subject to certain conditions. 33 U.S.C. § 535 *et seq*.

More than fifteen years ago, the Company decided to build a Twin Span in order to allow for maintenance of the Ambassador Bridge to be done without disrupting bridge traffic across the Detroit River. In 2012, acting pursuant to the IBA, the Governor of Michigan along with the Michigan Department of Transportation and the Michigan Strategic Fund entered into a Crossing Agreement with the Canadian Government to build another bridge within two miles of the Ambassador Bridge. The Secretary of State approved the Crossing Agreement pursuant to Section 3 of the IBA, and issued a Presidential Permit under Section 4 of the IBA pursuant to Executive Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 16, 1968), *amended by* Executive Order No. 13,337, 69 Fed. Reg. 25,299 (Apr. 30, 2004). Upon considering agency and public comments and environmental documentation, the Secretary concluded that the approval and the permit "would serve the national interest because the [bridge] would advance the United States' foreign policy interest in its bilateral relationship with Canada;" facilitate cross-border traffic, trade, and commerce; create jobs; and advance "national defense priorities." New International Bridge Record of Decision 1, 3 (Mar. 26, 2013) ("ROD").

The Company has challenged the lawfulness of the Crossing Agreement in state and federal court. A state court recently rejected the challenge to the State officials' authority to execute the Agreement. *Michigan Dep't of Transp. v. Riverview-Trenton R.R. Co., et. al.*, No. 17-000536-CC (Mich. Ct. App. Oct. 11, 2017).

Prior to that, in 2013, the Company filed in the United States District Court for the District of Columbia a nine-count complaint based on the non-delegation doctrine and various statutory objections.[1] The district court dismissed seven counts for failure to state a claim upon which relief can be granted, four of which are at issue in this appeal. *Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 109 (D.D.C. 2015). The district court denied the Company's motion for reconsideration of several dismissed counts. *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 110

---

[1]    Count 1 alleged Congress unconstitutionally delegated Compact Clause authority to the Secretary of State without an intelligible principle in Section 3 of the IBA.  Compl. ¶ 292.  Counts 2 and 3 sought declaratory and injunctive relief to prohibit Executive officials from supporting and approving the new government bridge, alleging this approval violated the Company's statutory and contractual franchise rights to maintain and operate the Ambassador Bridge and the Twin Span.  *Id.* ¶¶ 299, 305, 312-13, 321-24.  Count 4 alleged the Coast Guard unlawfully denied or delayed approval of the Company's application for a permit to build the Twin Span.  *Id.* ¶¶ 326, 327-30.  Count 5 alleged a taking and appropriation of the Company's private property in violation of the Takings Clause and Due Process Clause of the Fifth Amendment, U.S. CONST. amend. V.  *Id.* ¶¶ 335, 338-39.  Count 6 alleged the State Department's issuance of a Presidential Permit for the new governmental bridge was arbitrary and capricious in violation of the Administrative Procedure Act ("APA").  *Id.* ¶ 341.  Count 7 alleged the Secretary of State's approval of the Crossing Agreement violated the APA because the Agreement was invalid under Michigan law.  *Id.* ¶ 357.  Count 8 sought to enjoin all federal defendants from implementing or relying upon permits and approvals of the Crossing Agreement, because the approvals were unlawful and exceeded the defendants' authority.  *Id.* ¶¶ 364, 368-89.  Count 9 alleged the federal defendants had discriminated against the Company in favor of the government bridge in violation of the Equal Protection Clause of the Fifth Amendment, U.S. CONST. amend. V.  *Id.* ¶¶ 371-73.

(D.D.C. 2016). Another count was dismissed as moot pursuant to a mandate from this court. *Detroit Int'l Bridge Co. v. Gov't of Canada*, No. CV 10-476, 2016 WL 8377074, at \*1 (D.D.C. Apr. 7, 2016). The district court granted summary judgment on the remaining count, which the Company appeals, ruling that the claim could not proceed because the State of Michigan was an indispensable party, *see* FED. R. CIV. P. 19, and, alternatively, that the claim failed on the merits. *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 66, 70-71 (D.D.C. 2016).

**II.**

On appeal, the Company contends that the approval by the Secretary of State of the Crossing Agreement was contrary to Michigan law, and was therefore not an authorized approval under Section 3 of the IBA, and was, in any event, arbitrary and capricious. It also contends that the Company was entitled to declaratory and injunctive relief in order to prevent executive agencies from supporting and approving the new bridge pursuant to Section 3 and thereby blocking the Twin Span contrary to the will of Congress. Additionally, the Company contends that Congress unconstitutionally delegated its authority under the Compact Clause, U.S. CONST., art. I, § 10, cl. 3, in Section 3 of the IBA. Finally, the Company contends the district court not only had jurisdiction to review the Secretary's issuance of the Presidential Permit under Section 4 of the IBA, but also failed to recognize there was law to apply.

Our review of the dismissals of four counts and summary judgment on a fifth count is *de novo*. *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 944 (D.C. Cir. 2017); *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017).

6

The IBA provides, in pertinent part:

> The consent of Congress is hereby granted to the construction, maintenance, and operation of any bridge and approaches thereto, which will connect the United States with any foreign country (hereinafter in this subchapter referred to as an "international bridge") and to the collection of tolls for its use, so far as the United States has jurisdiction. Such consent shall be subject to (1) the approval of the proper authorities in the foreign country concerned; (2) [not at issue here]; and (3) [] the provisions of this subchapter.

33 U.S.C. § 535.

## A.

Section 3 provides Congressional consent for states to enter into international bridge agreements with Canada or Mexico and requires the Secretary of State's approval of the agreements. 33 U.S.C. § 535a.[2] The Company, viewing

---

[2] Section 3 of the IBA provides:

> The consent of Congress is hereby granted for a State or a subdivision or instrumentality thereof to enter into agreements —
> (1) with the Government of Canada, a Canadian Province, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Canada, or
> (2) with the Government of Mexico, a Mexican State, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Mexico, for the construction, operation, and maintenance of such bridge in accordance with the applicable provisions of this subchapter.

Section 3 to authorize approval of only valid agreements, raises three challenges to the Secretary's approval of the Crossing Agreement.

**1.** Regarding summary judgment on Count 7, the Company contends that the Secretary failed to inquire adequately into Michigan law, and to the extent an inquiry was made the Secretary's action was arbitrary and capricious. In particular, the Company points to state law that it maintains prohibited the State officials from executing the Crossing Agreement, and specifically maintains that the Urban Cooperation Act, 2011 Mich. Pub. Acts 63 § 384(1), and 2012 Mich. Pub. Acts 236 § 402(1) did not authorize the Governor, the Michigan Department of Transportation, or the Michigan Strategic Fund to execute the 2012 Crossing Agreement.

Neither the plain text of Section 3 nor other provisions of the IBA appear to require the Secretary to inquire into state law. *See* 33 U.S.C. §§ 535-535i. Instead, as the Secretary explained in responding to comments on the Crossing Agreement, the Secretary's function is to assess the effects the Crossing Agreement would have on the foreign policy of the United States. Resp. to Cmts., ROD, App. A at 4. But even assuming a state-law inquiry was required, the IBA does not require this court to review the state-law question *de novo*. Instead, the question for this court would be whether the Secretary made a "clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)). Finding no such error,

---

The effectiveness of such agreement shall be conditioned on its approval by the Secretary of State.

33 U.S.C. § 535a.

we conclude the district court properly granted summary judgment on Count 7 of the complaint.

The Secretary invited the Governor to explain whether Michigan State officials had legal authority to execute the Crossing Agreement, and received a letter from a Counsel to the Governor attaching a letter from a Deputy State Attorney General. Both letters represented that the Governor, the Michigan Department of Transportation, and the Michigan Strategic Fund did not require legislative approval to enter into the Crossing Agreement, and that the Crossing Agreement was valid under Michigan state law, including the Urban Cooperation Act. The Secretary relied on these letters in responding to public comments and that response was attached to the Record of Decision. *See* Resp. to Cmts., ROD, App. A. The Company objects that the letters contain only conclusory statements and states that the Secretary should have relied instead on letters from State legislators casting doubt on the authority of the Michigan officials to enter the Crossing Agreement. These objections do not, for purposes of Section 3, diminish the adequacy of the Secretary's inquiry or the correctness of the legal advice received, much less show that the Secretary was arbitrary and capricious in relying on the legal advice from the Office of the State Attorney General and Counsel to the Governor. The Secretary explained that the Michigan Attorney General "speaks authoritatively on Michigan law[,]" Resp. to Cmts., ROD, App. A at 4, and the Company does not show that relying on that legal advice was a clear error in judgment.

Notably, this is not a case in which the Michigan Supreme Court had spoken on the state-law question to the contrary or where there was evidence that the Crossing Agreement was facially invalid. Indeed, a court has confirmed the officials' authority. *See Michigan Dep't of Transp*, No. 17-000536-CC.

Additionally, the Company fails to show that the Crossing Agreement is plainly invalid under Michigan law. For instance, the Company maintains that the Crossing Agreement violates the Urban Cooperation Act of 1967, which provides that Michigan agencies can exercise only powers they share in common with other agencies or possess independently, Mich. Comp. Laws Ann. § 124.504, by authorizing the Michigan Department of Transportation and Strategic Fund to "'design, construct, finance, operate and maintain'" and collect tolls from an international bridge when the departments do not possess these powers jointly or separately, Applt's Br. 30 (quoting Crossing Agreement § II(a)); Crossing Agreement, § X. Those powers were granted to the Crossing Authority, which is a Canadian entity not subject to the Urban Cooperation Act's requirement for Michigan agencies. Crossing Agreement §§ II(a), V, X.

Additionally, two Michigan statutes referenced by the Company as prohibiting execution of the Crossing Agreement — 2011 Mich. Pub. Acts 63 § 384(1) and 2012 Mich. Pub. Acts 236 § 402(1) — involve appropriations for the Michigan Department of Transportation and Strategic Fund and the Company fails to show how they alter the authorization provided by the Urban Cooperation Act. Moreover, Michigan State legislative records indicate the legislature's concern was that Michigan not bear the costs of the new bridge, *see* 2013 Mich. Pub. Acts 59 § 384; 2014 Mich. Pub. Acts 252 §§ 384-85; 2015 Mich. Pub. Acts 84 §§ 384-85, and the Crossing Agreement calls for Canada to bear the costs of construction and maintenance, *see* Crossing Agreement §§ V(1), X(6), X(11), thus addressing the legislature's concern.

Because the Secretary did not clearly err in approving the Crossing Agreement, the district court properly granted federal appellees summary judgment on Count 7. This court, however,

need not decide whether the district court's basis for granting summary judgment — that the State of Michigan was an indispensable party under Federal Rule of Civil Procedure 19 — was correct. The Company may, of course, pursue its challenge to the Crossing Agreement in state court.

**2.** On the dismissal of Counts 2 and 3, the Company contends approval of the Crossing Agreement was unlawful because it contradicted federal laws supporting the Twin Span project by making it "economically impossible" for the Company to build the Twin Span. Applt's Br. 60. The Company points to its undisputed right to "maintain[] and operate" the Ambassador Bridge, Act of Mar. 4, 1921, 41 Stat. 1439, which it points out Congress has reaffirmed on several occasions, Applt's Br. 59 (citing Act of Apr. 17, 1924, 43 Stat. 103; Act of Mar. 3, 1925, 43 Stat. 1128; Act of May 13, 1926, 44 Stat. 535). The Company emphasizes that the 1972 Report of the House Committee on Foreign Affairs states that the IBA legislation "should not be construed to adversely affect the rights of those operating bridges previously authorized by the Congress to repair, replace, or enlarge existing bridges," H.R. REP. NO. 92-1303 at 3-4 (Aug. 3, 1972), understanding this to mean that its "perpetual right to operate the Ambassador Bridge includes the right to build the Twin Span," Applt's Br. 59. The Company also emphasizes that between 1998 and 2008, Congress appropriated "hundreds of millions of dollars for the Ambassador Bridge Gateway Project." *Id.* at 60; *see* Third Am. Compl. ¶ 132. The Report of the House Committee on Appropriations explained that the Project was to "accommodate . . . and protect plans . . . [for] a second span of the Ambassador Bridge." H.R. REP. NO. 107-722 at 101 (2002); *see* Third Am. Compl. ¶ 143. The Company draws the conclusion that these congressional actions necessarily evidence support for the profitable operation of the Ambassador Bridge, otherwise there would be no reason to

expend federal funds. *See* Applt's Br. 60-61. Approving the new bridge, the Company maintains, makes it economically impossible to build the Twin Span and thereby thwarts the will of Congress. *Id.*

Approval of the Crossing Agreement does not violate any rights Congress conferred on the Company and its predecessors in ownership of the Ambassador Bridge by the 1921 Act and subsequent appropriation acts for the Twin Span. The district court therefore properly dismissed Counts 2 and 3 of the complaint seeking declaratory and injunctive relief. Although Congress has authorized the private maintenance and operation of the Ambassador Bridge and funded aspects of the Twin Span project from federal funds, its enactments do not vest in the Company public rights beyond those that Congress specified. In *Charles River Bridge v. Warren Bridge*, 36 U.S. 420, 421 (1837), the Supreme Court rejected the notion of implied public rights. In that case, a private company filed suit to prevent the construction of a second bridge over the Charles River because, it maintained, the second bridge impermissibly "destroy[ed] the value" of its bridge. *Id.* at 422. The Court affirmed denial of the requested injunction, reasoning that in authorizing the company to operate its bridge, the Massachusetts legislature had not specified a right to exclusivity and "[i]n grants by the public, nothing passes by implication." *Id.* at 421-423, 553 (citing *Jackson v. Lamphire*, 28 U.S. 280, 287 (1830)).

The Company, too, seeks the benefit of an implied right. But it has pointed to nothing to show that Congress intended the Ambassador Bridge to be perpetually profitable for its owners. *Contra* Applt's Br. 61. Failing to find an explicit statement in statutory text, the Company turns to legislative history. Even assuming such history could support a claim to an exclusive franchise, the Company overreads that history. For instance, the 1972 House Committee Report stated that the

IBA should not "adversely affect" bridge owners' rights to "repair, replace, or enlarge existing bridges," H.R. REP. NO. 92-1303 at 3-4 (Aug. 3, 1972), but neither implies an exclusive right to span the Detroit River nor mentions any right to maintain and operate the Ambassador Bridge profitably. Similarly, the 2002 House Committee Report stated that the funds appropriated by Congress should be used to "protect plans" for the Twin Span, not to protect profitable operation of the Ambassador Bridge, much less to do so in perpetuity. H.R. REP. NO. 107-722 at 101 (2002). Even if Congress could be deemed to have assumed its actions would help to ensure maintenance of a viable river crossing, the Company has not shown Congress granted it an express right to operate the Ambassador Bridge profitably, and such a right cannot be implied from the statutory text or legislative history.

**3.** The Company challenges the dismissal of its non-delegation claim, Count 1, regarding the delegation in Section 3 of the IBA to the Secretary of State, on the ground that Congress provided no intelligible principle to apply. In its view, the delegation was unconstitutional because the statute itself did not provide an intelligible principle to guide the exercise of the Secretary's discretion. *See* Applt's Br. 42. But, as the government suggests, this is inconsistent with Supreme Court instruction and this court's precedent; that is, the intelligible principle here derives from the narrow context of the IBA on international bridges and agreements with foreign nations, combined with the delegation of authority to the Secretary of State. *See* Appellee's Br. 21-23.

The Supreme Court has instructed that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001). "Congress — in giving the Executive authority over matters of foreign affairs

— must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). The Company relies on the statement in *Whitman*, 531 U.S. at 472, that Congress must "lay down by legislative act an intelligible principle." (internal quotation marks and citation omitted). But the Supreme Court has explained that the delegation "need not be tested in isolation" and "derive[s] much meaningful content from the purpose of the Act, its factual background and the statutory context in which [it] appear[s]." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946).

Applying these principles, this court has held that a delegation authorizing the Secretary of the Interior, who has a trust obligation with respect to Indians, *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 211 (2012), "'to acquire real property for the [Pokagon Indian] Band,'" *TOMAC v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting 25 U.S.C. § 1300j-5), was not unconstitutional because it was "cabined by 'intelligible principles' delineating both the area in and the purpose for which the land should be purchased," *id.* at 867. Here too, the Secretary's authority is limited by an "area" — navigable waters between the U.S. and Canada or Mexico — and a "purpose" — the construction of international bridges. Thus, the intelligible principle is that in view of the Secretary's mission relating to foreign affairs, *see Zemel*, 381 U.S. at 17, the Secretary will review international bridge agreements for their potential impact on United States foreign policy, *see TOMAC*, 433 F.3d at 866-67.

The Company's reliance on *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), is misplaced. In that case, the Supreme Court held a delegation was unconstitutional because the statute delegated to the President "unlimited authority" to

prohibit interstate and foreign commerce of petroleum and petroleum products, and the statute or its context "contain[ed] nothing as to the circumstances or conditions" in which the power should be exercised. *Id.* at 415-17. Here, the IBA supplies the narrow circumstance of international bridge agreements with Canada and Mexico. *See* 33 U.S.C. § 535a, *supra* note 2.

**B.**

Under IBA Section 4, no international bridge may be constructed without Presidential approval. 33 U.S.C. § 535b.[3] By Executive Order in 1968, as amended in 2004, the President authorized the Secretary of State to issue permits approving bridges under Section 4 unless there is disagreement among consulted agencies, in which event the matter is returned to the President "for consideration and a final decision." Exec. Order 13,337, 69 Fed. Reg. 25,299, § 1(g)-(i). Challenging the dismissal of Count 6, the Company acknowledges that Presidential action is not subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704.

---

[3] Section 4 provides:

> No bridge may be constructed, maintained, and operated as provided in section 535 of this title unless the President has given his approval thereto. In the course of determining whether to grant such approval, the President shall secure the advice and recommendations of (1) the United States section of the International Boundary and Water Commission, United States and Mexico, in the case of a bridge connecting the United States and Mexico, and (2) the heads of such departments and agencies of the Federal Government as he deems appropriate to determine the necessity for such bridge.

33 U.S.C. § 535b.

Applt's Br. 51-52 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992)). Rather, it maintains that the issuance of a Presidential Permit by the Secretary of State is final agency action, regardless of whether this authority was delegated by the President, and thus it is reviewable pursuant to the APA. But even if the Presidential Permit issuance were agency action, it is unreviewable under the APA because it is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

The 1968 Executive Order on Presidential Permits stated that "the *proper conduct of the foreign relations* of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country." Exec. Order 11,423, 33 Fed. Reg. 11,741, pmble. (emphasis added). The 2004 Executive Order affirmed that the Secretary should issue a Presidential Permit if doing so "would serve the national interest." Exec. Order 13,337, 69 Fed. Reg. 25,299, § 1(g); *see* Exec. Order 11,423, 33 Fed. Reg. 11,741, § 1(d). In the foreign affairs arena, the court lacks a standard to review the agency action. As the court explained in *Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Marine Admin., et al.*, 215 F.3d 37, 42 (D.C. Cir. 2000), generally "judgments on questions of foreign policy and national interest . . . are not subjects fit for judicial involvement." "By long-standing tradition, courts have been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997).

The Company offers no persuasive argument for adopting a different approach with respect to issuance of the Section 4 Presidential Permit here. Its reliance on *Dickson v. Sec'y of*

*Def.*, 68 F.3d 1396 (D.C. Cir. 1995), and *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993), is misplaced. The issue in those cases arose in the context of military discharge classifications and Medicare reimbursement, respectively. By contrast, the context surrounding issuance of a Section 4 Presidential Permit under the IBA involves a determination rife with executive discretion in an area that the U.S. Constitution principally vests in the political branches. *See e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Because the challenged issuance is not subject to judicial review, the court need not decide whether the issuance is presidential action under *Franklin*, 505 U.S. 788.

Accordingly, we affirm the judgment of the district court dismissing Counts 1, 2, 3, and 6, and granting summary judgment on Count 7.