*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF TRANSPORTATION,

      Plaintiff-Appellee,

v

RIVERVIEW-TRENTON RAILROAD
COMPANY and CENTRAL TRANSPORT, LLC,

      Defendants-Appellants,

and

CITY OF DETROIT, DOME PIPELINE
CORPORATION, DTE ELECTRIC COMPANY,
EES COKE BATTERY, LLC, ECONOMIC
DEVELOPMENT CORPORATION OF THE
CITY OF DETROIT, EDW C. LEVY CO.,
HONEYWELL INTERNATIONAL, INC.,
INTERNATIONAL TRANSMISSION
COMPANY, J.P. MORGAN CHASE BANK NA,
S&L DEVELOPMENT CO., and UNITED
STATES STEEL CORP.,

      Defendants.

FOR PUBLICATION
June 18, 2020
9:00 a.m.

No. 345708
Wayne Circuit Court
LC No. 17-000536-CC

DEPARTMENT OF TRANSPORTATION,

      Plaintiff-Appellee,

v

CROWN ENTERPRISES, INC.,

      Defendant-Appellant,
and

No. 346105
Wayne Circuit Court
LC No. 17-000530-CC

-1-

CITY OF DETROIT and DEPARTMENT OF
NATURAL RESOURCES,

        Defendants.

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

CROWN ENTERPRISES, INC.,

        Defendant-Appellant,

and

CITY OF DETROIT,

        Defendant.

No. 346106
Wayne Circuit Court
LC No. 17-000531-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

DIBDETROIT, LLC,

        Defendant-Appellant,

and

CITY OF DETROIT,

        Defendant.

No. 346107
Wayne Circuit Court
LC No. 17-000533-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

No. 346108
Wayne Circuit Court

DIBDETROIT, LLC,                                                    LC No.  17-000534-CC

        Defendant-Appellant,

and

DEPARTMENT OF NATURAL RESOURCES,

        Defendant.

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v                                                                  No.  346109
                                                                   Wayne Circuit Court
DETROIT INTERNATIONAL BRIDGE                                       LC No.  17-000537-CC
COMPANY,

        Defendant-Appellant,

and

CITY OF DETROIT and DEPARTMENT OF
NATURAL RESOURCES,

        Defendants.

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v                                                                  No.  346110
                                                                   Wayne Circuit Court
CROWN ENTERPRISES, INC.,                                           LC No.  17-000538-CC

        Defendant-Appellant,

and

WAYNE SCRAP IRON & METAL COMPANY
and CITY OF DETROIT,

        Defendants.

-3-

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

DIBDETROIT, LLC,

        Defendant-Appellant,

and

CITY OF DETROIT, BENJAMIN ZUCKER or
His Unknown Heirs, Devisees, Legatees and
Assigns, and ROSE ZUCKER or Her Unknown
Heirs, Devisees, Legatees and Assigns,

        Defendants.

No. 346111
Wayne Circuit Court
LC No. 17-000539-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

CROWN ENTERPRISES, INC.,

        Defendant-Appellant,

and

ARCOLA CLARK or Her Unknown Heirs,
Devisees, Legatees and Assigns, GWENDOLYN
MARIE SMITH or Her Unknown Heirs, Devisees,
Legatees and Assigns, and CITY OF DETROIT,

        Defendants.

No. 346112
Wayne Circuit Court
LC No. 17-000540-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

No. 346113

CROWN ENTERPRISES, INC.,

        Defendant-Appellant,

and

CITY OF DETROIT,

        Defendant.

Wayne Circuit Court
LC No.   17-000541-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

CROWN ENTERPRISES, INC.,

        Defendant-Appellant,

and

CITY OF DETROIT, DTE ELECTRIC
COMPANY, EXPRESS SERVICE
ENTERPRISES, INC., FLAGSTAR BANCORP,
INC., THOMAS MCALLEN or His Unknown
Heirs, Devisees, Legatees and Assigns, AILEEN
MCALLEN or Her Unknown Heirs, Devisees,
Legatees and Assigns, BUSINESS LOAN
CENTER, LLC, UNITED STATES OF
AMERICA DEPARTMENT OF
TREASURY/INTERNAL REVENUE SERVICE,
and AFT INVESTMENTS, LLC,

        Defendants.

No.   346114
Wayne Circuit Court
LC No.   17-000542-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

No.   346115
Wayne Circuit Court

-5-

DIBDETROIT, LLC,                                              LC No.  17-000544-CC

   Defendant-Appellant,

and

MORTON INDUSTRIAL GROUP, INC., as
Successor in Interest to MCLOUTH STEEL
CORPORATION, DEPARTMENT OF
NATURAL RESOURCES, and CITY OF
DETROIT,

   Defendants.

---

DEPARTMENT OF TRANSPORTATION,

   Plaintiff-Appellee,

v                                                            No.  346116
                                                             Wayne Circuit Court
DIBDETROIT, LLC,                                             LC No.  17-000545-CC

   Defendant-Appellant,

and

IRENE GARZA and CITY OF DETROIT,

   Defendants.

---

DEPARTMENT OF TRANSPORTATION,

   Plaintiff-Appellee,

v                                                            No.  346117
                                                             Wayne Circuit Court
CROWN ENTERPRISES, INC.,                                     LC No.  17-000546-CC

   Defendant-Appellant,

and

---

-6-

DEPARTMENT OF NATURAL RESOURCES
and CITY OF DETROIT,

Defendants.

DEPARTMENT OF TRANSPORTATION,

Plaintiff-Appellee,

v

CROWN ENTERPRISES, INC.,

Defendant-Appellant,

and

CURTIS PENICK and CITY OF DETROIT,

Defendants.

No.   346118
Wayne Circuit Court
LC No.   17-000547-CC

DEPARTMENT OF TRANSPORTATION,

Plaintiff-Appellee,

v

CROWN ENTERPRISES, INC.,

Defendant-Appellant,

and

RYE GENTRY TRUCKING, INC., CAROL A.
GENTRY TRUST DATED 11/8/2000 As it May
be Amended, and CAROL A. GENTRY,
Individually and as Trustee,

Defendants.

No.   346119
Wayne Circuit Court
LC No.   17-000548-CC

DEPARTMENT OF TRANSPORTATION,

Plaintiff-Appellee,

-7-

v

DIBDETROIT, LLC,

        Defendant-Appellant,

and

CITY OF DETROIT,

        Defendant.

No.  346120
Wayne Circuit Court
LC No.  17-006977-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

DIBDETROIT, LLC,

        Defendant-Appellant,

and

CITY OF DETROIT, DEPARTMENT OF
NATURAL RESOURCES, SAMIR HABIB-
SHAMKH AL-FATLAWI, MARIA ANTONIETA
PARDO-DE-GARCIA, MARJORIE ZAIZAR, and
RAMIRO ZAIZAR,

        Defendants.

No.  346121
Wayne Circuit Court
LC No.  17-006979-CC

---

DEPARTMENT OF TRANSPORTATION,

        Plaintiff-Appellee,

v

DIBDETROIT, LLC,

        Defendant-Appellant,

and

No.  346122
Wayne Circuit Court
LC No.  17-006980-CC

-8-

DEPARTMENT OF NATURAL RESOURCES,

        Defendant.

_____

Before: CAVANAGH, P.J., and STEPHENS and M. J. KELLY, JJ.

PER CURIAM.

In these 19 consolidated appeals,[1] various entities controlled by Manuel "Matty" Moroun (the Moroun entities) appeal by leave granted[2] two orders of the circuit court rejecting challenges

---

[1] *Dep't of Transportation v Riverview-Trenton RR Co*, unpublished order of the Court of Appeals, entered April 1, 2019 (Docket Nos. 345708 and 346105 through 346122).

[2] *Dep't of Transportation v Riverview-Trenton RR Co*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 345708); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346105); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346106); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346107); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346108); *Dep't of Transportation v Detroit Int'l Bridge Co*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346109); *Dep't of Transportation v Crown Ent*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346110); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346111); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346112); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346113); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346114); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346115); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346116); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346117); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346118); *Dep't of Transportation v Crown Ent, Inc*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346119); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346120); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346121); *Dep't of Transportation v DIBDETROIT, LLC*, unpublished order of the Court of Appeals, entered February 12, 2019 (Docket No. 346122).

to the authority of the Michigan Department of Transportation (MDOT) to condemn property for the construction of the Gordie Howe International Bridge (GHIB).  We affirm.

## I. FACTS

The history of the GHIB extends back nearly two full decades.  We need not provide extensive detail to resolve the present matter, and as such, provide a limited summary of the relevant facts, the majority of which involve appropriations bills enacted since 2011 and other litigation involving the GHIB.

MDOT, the Federal Highway Administration (FHA), Transport Canada, and the Ontario Ministry of Transportation formed a partnership in 2001 to investigate the feasibility of constructing a new international bridge connecting Detroit and Windsor, Ontario.  See *Latin Americans for Social & Economic Dev v Administrator of the FHA*, 756 F3d 447, 454 (CA 6, 2014).  A lengthy process resulted in the selection in 2009 of Detroit's Delray neighborhood as the preferred location for the site of a new international bridge.[3]  *Id*. at 451, 453-461.

In an appropriations bill that took effect on June 21, 2011, our Legislature included the following language as Art XVII, Part 2, § 384 of 2011 PA 63 (Section 384):

(1) The department shall not expend any state transportation revenue for construction planning or construction of the Detroit River International Crossing or a renamed successor.  In addition, except as provided in subsection (3), the department shall not commit the state to any new contract related to the construction planning or construction of the Detroit River International Crossing or a renamed successor unless the legislature has enacted specific enabling legislation to allow for the construction of the Detroit River International Crossing or a renamed successor.

(2) On or before March 31, 2012, the department shall report to the state budget director, the house and senate appropriations subcommittees on transportation, and the house and senate fiscal agencies on department activities related to the Detroit River International Crossing or a renamed successor.

---

[3] The result of this process was the issuance of a Record of Decision (ROD) by the FHA.  *Latin Americans*, 756 F3d at 451.  The Moroun-owned Detroit International Bridge Company was a plaintiff in *Latin Americans*, a lawsuit that ended with the affirmance of the ROD.  *Id*. at 477.  The Moroun-owned Canadian Transport Company unsuccessfully sought to have the ROD overturned in the Canadian court system.  *Canadian Transit Co v Canada (Minister of Transport)*, 59 CELR (3d) 127; 2011 FC 515 (2011).  Moroun also sought to challenge MDOT's pursuit of the project in the Court of Claims.  That action was likewise unsuccessful.  *Detroit Int'l Bridge Co v Dep't of Transportation*, unpublished per curiam opinion of the Court of Appeals, issued December 6, 2011 (Docket No. 298276).  These lawsuits predated the execution of the Crossing Agreement that is at the core of the present matter.

(3) If the legislature enacts specific enabling legislation for the construction of the Detroit River International Crossing or a renamed successor, subsection (1) does not apply once the enabling legislation goes into effect.

Subsequently, a bill that would have authorized the new international bridge died in Michigan's Senate after being rejected by a committee vote in October 2011.[4]

Nonetheless, on June 15, 2012, Her Majesty the Queen in Right of Canada (represented by the Minister of Transport) (Canada), the Windsor-Detroit Bridge Authority (WDBA), and the State of Michigan, "as represented by its Governor, and by and through," MDOT and the Michigan Strategic Fund (MSF), entered into the Crossing Agreement, which:

> . . . provide[d] a framework for a Crossing Authority established by Canada to design, construct, finance, operate and maintain a new International Crossing between Canada and Michigan, under the oversight of a jointly established International Authority with three members appointed by Canada and the Crossing Authority and three members appointed by the Michigan Parties, and with funding approved by Canada, but with no funding by the Michigan Parties. The Michigan Parties are not obligated to pay any of the costs of the new International Crossing.

The "purpose" section of the agreement explains that the purpose of the Crossing Agreement is to "provide a framework for the Crossing Authority to" design, construct, finance, operate, and maintain the GHIB and a "US Federal Plaza" "with the assistance as necessary, but not funding by, Michigan[.]"

Under the Crossing Agreement, the Canadian Crossing Authority "shall be responsible for International Crossing Project Activities and shall be responsible for the design, construction, financing, operation and maintenance of the International Crossing . . . ." The Crossing Authority is also given authority to collect tolls. MDOT is responsible for acquiring, through condemnation if necessary, Michigan land needed for construction of the bridge. However, funding for acquiring property comes from Canada through the Crossing Authority. At his deposition, Myron Frierson, the Deputy Director for Finance Administration for MDOT, explained that the parties have created a reimbursement procedure. MDOT and the WDBA agree to a budget for anticipated activities, and the WDBA places funds in escrow. MDOT spends money out of the state trunkline fund, and sends invoices to the WDBA. Invoices are approved by the WDBA and the escrow agent disburses funds to MDOT, which are placed in the state trunkline fund.

In its June 26, 2012 appropriations bill, the Legislature reenacted Section 384 with its prohibition against MDOT "expend[ing] any state transportation revenue for construction planning or construction of the Detroit River International Crossing or a renamed successor[]" absent Legislative authorization for construction of the GHIB. 2012 PA 200, Art XVII, Part 2, § 384(1)

---

[4] See *Detroit-Windsor Bridge fails to clear hurdle as Senate panel rejects legislation*, October 20, 2011; available at https://www.mlive.com/politics/2011/10/detroit-windsor_bridge_fails_t.html (accessed May 13, 2020).

and (3). MDOT was again required to provide quarterly reports to various entities regarding its activities related to the GHIB. 2012 PA 200, Art XVII, Part 2, § 384(2).

But this language was modified in the Legislature's 2013 appropriations bill. Pursuant to 2013 PA 59, Art XVII, Part 2, § 384:

(1) Except as otherwise provided in subsection (2), the department shall not *obligate the state to expend any state transportation revenue* for construction planning or construction of the Detroit River International Crossing or a renamed successor. In addition, except as provided in subsection (2), the department shall not commit the state to any new contract related to the construction planning or construction of the Detroit River International Crossing or a renamed successor *that would obligate the state to expend any state transportation revenue. An expenditure for staff resources used in connection with project activities, which expenditure is subject to full and prompt reimbursement from Canada, shall not be considered an expenditure of state transportation revenue.*

(2) If the legislature enacts specific enabling legislation for the construction of the Detroit River International Crossing or a renamed successor, subsection (1) does not apply once the enabling legislation goes into effect. [Emphasis added.]

The reporting requirement that had been stated in Section 384(2) was replaced with the following in Section 385:

(1) The department shall submit reports to the state budget director, the speaker of the house, the house minority leader, the senate majority leader, the senate minority leader, the house and senate appropriations subcommittees on transportation, and the house and senate fiscal agencies on department activities related to all nonconstruction or construction planning activities related to the Detroit River International Crossing or a renamed successor. The initial report shall be submitted on or before December 1, 2013 and shall cover the fiscal year ending September 30, 2013.

(2) The initial report shall include, at a minimum, all of the following:

(a) Department costs incurred in the fiscal year ending September 30, 2013, including employee salaries, wages, benefits, travel, and contractual services, and what activities those costs were related to.

(b) Costs of other executive branch agencies incurred in the fiscal year ending September 30, 2013, including employee salaries, wages, benefits, travel, and contractual services, and what activities those costs were related to.

(c) A breakdown of the source of funds used for the activities described in subdivisions (a) and (b).

(d) *A breakdown of reimbursements made by Canada under section 384(1) to the state for expenditures for staff resources used in connection with project activities.*

(e) *A narrative description of the status of the Detroit River International Crossing or a renamed successor, including efforts undertaken to implement provisions of the crossing agreement executed June 15, 2012 by representatives of the Canadian government and this state.*

(3) After submission of the initial report, a subsequent report shall be submitted on March 1, 2014, June 1, 2014, and September 1, 2014 and shall include the same information described in subsection (2) for the applicable previous fiscal quarter. [2013 PA 59, Art XVII, Part 2, § 385 (emphasis added).]

Other than changing the appropriate dates where needed, and revising the name "Detroit River International Crossing" to the project's new name, the "Gordie Howe International Crossing," the language of Sections 384 and 385 remained unchanged in each annual appropriations bill until 2019. See 2014 PA 252, Art XVII, Part 2, §§ 384 and 385; 2015 PA 84, Art XVII, Part 2, §§ 384 and 385; 2016 PA 268, Art XVII, Part 2, §§ 384 and 385; 2017 PA 107, Art XVII, Part 2, §§ 384 and 385; 2018 PA 207, Art XVII, Part 2, §§ 384 and 385. In the 2019 appropriations bill, Section 384 remains unchanged. 2019 PA 66, Art XVII, Part 2, §§ 384. Section 385, concerning reporting requirements, has been simplified as follows:

(1) The department shall submit monthly reports to the state budget director, the speaker of the house of representatives, the house of representatives minority leader, the senate majority leader, the senate minority leader, the house and senate appropriations subcommittees on transportation, and the house and senate fiscal agencies on all of the following:

(a) All expenditures by the state related to the Gordie Howe Bridge.

(b) All reimbursements made by Canada under section 384(1) of this part to the state for expenditures for staff resources used in connection with project activities.

(2) The initial report required under subsection (1) shall be submitted on or before December 1, 2019. The initial report shall cover the fiscal year ending September 30, 2019. [2019 PA 66, Art XVII, Part 2, §§ 385.]

The Crossing Agreement has been the subject of prior litigation between MDOT and the Moroun entities. After receiving good-faith offers for the purchase of the properties at issue in the present appeals in December 2016, the Moroun entities filed a lawsuit in the Court of Claims seeking declaratory and injunctive relief. Much the same as in the present appeals, the Moroun entities sought to have the Crossing Agreement declared invalid. This Court affirmed the dismissal of the suit. While this Court held that the Moroun entities had standing to raise their challenges, this Court held that the suit was properly dismissed by the Court of Claims because the Moroun entities failed to file the suit within a year of the date the claim accrued (which this Court determined was in 2012 when the Crossing Agreement was executed) pursuant to MCL

600.6431(1). *Crown Enterprises, Inc v State of Mich*, unpublished per curiam opinion of the Court of Appeals, issued May 8, 2018 (Docket No. 340039). The Moroun entities sought to have the Crossing Agreement declared invalid in a lawsuit filed in federal court, but that action was not successful. See *Detroit Int'l Bridge Co v Government of Canada*, 434 US App DC 317; 883 F3d 895 (2018).

The present appeals arise out of condemnation proceedings instituted in 2017 while the Court of Claims matter was pending.[5] The various lower court cases were consolidated and argued together. The circuit court directed the Moroun entities to clearly identify each specific legal challenge, filing each as a separate motion. The Moroun entities ultimately identified 18 separate legal challenges, all of which were rejected by the trial court. The Moroun entities argue on appeal that the circuit court was wrong to reject six of these challenges, apparently abandoning the remainder. These challenges were brought pursuant to MCR 2.116(C)(4) (lack of subject-matter jurisdiction), (C)(5) (lack of capacity to sue), (C)(8) (failure to state a claim), and/or (C)(10) (no material question of fact). All motions also purported to seek rulings regarding necessity pursuant to MCL 213.56, which states, in relevant part:

> (1) Within the time prescribed to responsively plead after service of a complaint, an owner of the property desiring to challenge the necessity of acquisition of all or part of the property for the purposes stated in the complaint may file a motion in the pending action asking that the necessity be reviewed. The hearing shall be held within 30 days after the filing of the motion.
>
> (2) With respect to an acquisition by a public agency, the determination of public necessity by that agency is binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion.
>
> * * *
>
> (5) The court's determination of a motion to review necessity is a final judgment.
>
> (6) Notwithstanding section 309 of the revised judicature act of 1961, Act No. 236 of the Public Acts of 1961, being section 600.309 of the Michigan Compiled Laws, an order of the court upholding or determining public necessity or upholding the validity of the condemnation proceeding is appealable to the court of appeals only by leave of that court pursuant to the general court rules. In the absence of a timely

---

[5] The Moroun entities previously sought leave to appeal an order denying their motions to dismiss the condemnation suits, which were brought under MCR 2.116(C)(6) on the basis that the Court of Claims suit precluded litigation of the condemnation suits in Wayne Circuit Court. This Court denied leave to appeal in each of those appeals for failure to persuade the Court of the need for immediate appellate review. See, e.g., *Dep't of Transportation v Riverview-Trenton RR Co*, unpublished order of the Court of Appeals, entered May 5, 2017 (Docket No. 337664). The Moroun entities have not challenged the denial of the MCR 2.116(C)(6) motions in the instant appeals.

filed appeal of the order, an appeal shall not be granted and the order is not appealable as part of an appeal from a judgment as to just compensation.

(7) If a motion to review necessity is not filed as provided in this section, necessity shall be conclusively presumed to exist and the right to have necessity reviewed or further considered is waived.

The first challenge pursued by the Moroun entities on appeal argues that MDOT was not authorized to enter into the Crossing Agreement because such action was prohibited by the first appropriations bill at issue, 2011 PA 63. The second challenge pursued on appeal contends that MDOT has no authority to pay just compensation for land acquired for the GHIB project. The third challenge pursued on appeal argues that MDOT cannot use the state trunkline fund to pay expenses and receive reimbursement from Canada. The fourth challenge pursued on appeal is a claim that the takings are invalid because MDOT lacks authority to collect tolls on the GHIB when it is complete. The fifth challenge raised on appeal claims that certain provisions concerning tolling contained within the Crossing Agreement illegally limit the authority of the Legislature to impose tolls on the GHIB in the future. Finally, the sixth challenge raised on appeal argues that the GHIB will be a "commercial enterprise," and that the operation of a commercial enterprise on a limited-access highway is prohibited by MCL 252.52(1), a provision of the Limited Access Highway Act (LAH Act), MCL 252.51 *et seq*.[6]

MDOT argues first that the entire appeal has been rendered nonjusticiable, and second, that the trial court was correct to reject the Moroun entities' challenges. We begin our analysis with a discussion of MDOT's justiciability concern.

## II. DISCUSSION

## A. JUSTICIABILITY

MDOT argues that the six issues raised on appeal have been rendered nonjusticiable because the Moroun entities have not pursued on appeal a challenge to the circuit court's conclusion that MDOT's authority to take the properties at issue may be derived from the LAH Act and the State Agencies Act, MCL 213.21 *et seq*. According to MDOT, with that challenge having been abandoned, the remaining challenges that have been pursued on appeal do not amount to challenges raising an error of law related to the condemnation of the Moroun entities' land. Thus, according to MDOT, the Moroun entities no longer raise questions that may be decided in a condemnation action pursuant to MCL 213.56(2). Rather, MDOT contends that the issues being pursued on appeal are only ancillary challenges to the validity of the Crossing Agreement that

---

[6] An amicus curiae brief has been filed on behalf of the "Michigan Legislators," a group of current and former state legislators who, like the Moroun entities, oppose the GHIB project. As is now required by MCR 7.212(H)(3), the amicus brief indicates "whether counsel for a party authored the brief in whole or in part and whether such counsel or a party made a monetary contribution intended to fund the preparation or submission of the brief . . . ." The amicus brief discloses that it was authored by the Moroun entities' counsel, and was also paid for by the Moroun entities.

-15-

should have been properly raised and decided in a declaratory suit filed in the Court of Claims. We disagree.

## 1. ISSUE PRESERVATION AND STANDARD OF REVIEW

We first note that while MDOT raised a similar argument with respect to some of the challenges raised in the circuit court, it did not claim below that all of the issues raised on appeal could not be properly raised in a condemnation suit. Thus, while the issue is preserved in some respects, it is unpreserved in others. See *Mouzon v Achievable Visions*, 308 Mich App 415, 419; 864 NW2d 606 (2014). Indeed, to the extent MDOT failed to argue in the trial court that certain challenges were not proper challenges to be raised in a condemnation suit, we could deem MDOT's justiciability challenge waived. See *Walters v Nadell*, 481 Mich 377, 387-388; 751 NW2d 431 (2008) (issues not raised in the trial court are ordinarily deemed waived and will not be reviewed by an appellate court). However, this Court may exercise its inherent authority to review issues that were not raised in the circuit court. *Id.* at 387. MDOT's arguments present purely legal questions for which all of the relevant facts have been presented, and to the extent the issue is not preserved, we thus choose to exercise our inherent authority to address MDOT's argument in full. See *id.*; *Smith v Foerster-Bolser Const, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006).

This issue essentially is a question of statutory interpretation; specifically, it is a question whether the Moroun entities' challenges are challenges that are not properly raised pursuant to MCL 213.56(2). Questions of statutory interpretation are reviewed de novo on appeal. *City of Riverview v Sibley Limestone*, 270 Mich App 627, 636; 716 NW2d 615 (2006).

## 2. ANALYSIS

The instant matter consists of several condemnation actions brought by MDOT against the Moroun entities to acquire real property. These suits are brought under the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.* The UCPA "is merely a procedural statute . . . ." *City of Kalamazoo v KTS Indus, Inc*, 263 Mich App 23, 32; 687 NW2d 319 (2004). Pursuant to MCL 213.56(1), "[w]ithin the time prescribed to responsively plead after service of a complaint, an owner of the property desiring to challenge the necessity of acquisition of all or part of the property for the purposes stated in the complaint may file a motion in the pending action asking that the necessity be reviewed." Pursuant to MCL 213.56(2), "With respect to an acquisition by a public agency, the determination of public necessity by that agency is binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion." Thus, "pursuant to the statute, the determination of necessity is left not to the courts but to the public agency . . . . The only justiciable challenge following the agency's determination is one based on 'fraud, error of law, or abuse of discretion.' MCL 213.56(2)." *City of Novi v Robert Adell Children's Funded Trust*, 473 Mich 242, 253; 701 NW2d 144 (2005).

MDOT argues that an "error of law" exists only where the condemning agency lacks legal authority to condemn property for the purpose specified in the complaint. MDOT relies on *City of Novi*, 473 Mich at 253, where the Court, in a single sentence, stated that because the "plaintiff has the legal authority to condemn this land for a public road, . . . it has not made an error of law." We do not read *City of Novi* as standing for the premise that a lack of legal authority to condemn is the one and only "error of law" that is cognizable under MCL 213.56(2). In a footnote, the

-16-

Court explained that the defendants in *City of Novi* had argued that the condemnation action was "not supported by appropriate enabling legislation." *City of Novi*, 473 Mich at 253 n 9. The Court rejected that contention. *Id.* Thus, it seems that the only claimed error of law in *City of Novi* was a lack of authority to condemn. Given that the Court did not discuss the scope of MCL 213.56(2) in any detail, we read the decision in *City of Novi* as standing only for the premise that the claimed legal error in that case—a lack of legal authority to condemn—did not occur. The case does not purport to set the scope of what may or may not amount to an error of law under MCL 213.56(2). Thus, MDOT has not shown that the Moroun entities' challenges fall outside the scope of what may be decided in this condemnation suit.[7]

There is also a substantial gap in MDOT's analysis. MDOT asserts that the appeal is rendered nonjusticiable if the Moroun entities' challenges do not amount to purported errors of law that could be raised under MCL 213.56(2). What MDOT does not do is explain whether only necessity challenges may be made in a condemnation action. In that regard, we note that MCL 213.56(6) appears to contemplate at least two types of challenges, as it describes two types of orders that may be appealed by way of an application for leave to appeal filed in this Court: "an order of the court upholding or determining public necessity *or* upholding the validity of the condemnation proceeding . . . ." MCL 213.56(6) (emphasis added). MDOT has not addressed whether the Moroun entities' appellate challenges could be viewed as raising challenges to the validity of the condemnation proceeding. Certainly, the Moroun entities view them as such; the Moroun entities allege that the condemnation proceedings are invalid because they seek to acquire land for a project that the Moroun entities believe is illegal.

We also note that when arguing the appeal from the order dismissing the Court of Claims action, in which the Moroun entities sought to raise largely the same substantive challenges that were raised in the circuit court, MDOT represented to this Court that dismissal of the Court of Claims action would have no adverse impact on the Moroun entities because the same issues were—and could—be litigated in this condemnation action. This representation was made repeatedly in MDOT's appellate briefing and again at oral argument.[8]

---

[7] MDOT also relies on *Condemnation for Route 58018*, 31 PA Cmwlth 275, 280-281; 375 A2d 1364 (1977), which MDOT cites as standing for the premise that the only permitted challenges in a condemnation suit are those that challenge the power or right of the governmental entity to take land or procedures directly related to the taking. The decision in *Condemnation for Route 58018* addressed what arguments could be made under Pennsylvania's statutory scheme as preliminary objections to a condemnation action. *Id.* What procedures were allowed by Pennsylvania's statutory scheme some 40 years ago would seem to have little relevance to what is permitted by Michigan's current UCPA, and MDOT makes no attempt whatsoever to show that the two schemes are alike.

[8] It is perhaps most ironic that, while MDOT has argued in this case that the Moroun entities should have raised their challenges in a timely suit for declaratory relief in the Court of Claims, MDOT previously argued to this Court in Docket No. 340039 that such a declaratory suit would be improper because it would encourage time-consuming, pre-condemnation litigation.

As this Court explained in *Spohn v Van Dyke Pub Sch*, 296 Mich App 470, 489; 822 NW2d 239 (2012):

> The doctrine of judicial estoppel is driven by the important motive of promoting truthfulness and fair dealing in court proceedings. Judicial estoppel differs from such other forms of estoppel as promissory estoppel and equitable estoppel in that judicial estoppel focuses on the relationship between the litigant and the judicial system as a whole, rather than solely on the relationship between the parties. Of utmost importance in determining whether to apply the doctrine of judicial estoppel is whether the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped. [Quotation and ellipses omitted.]

Ultimately, judicial estoppel is an equitable doctrine. *Id*. at 479. It is used to preserve the integrity of the courts and to prevent abuse of the system through "cynical gamesmanship." *Id*. at 479-480 (quotation marks and citations omitted). But it must be applied carefully, as ultimately, use of the doctrine "precludes a contradictory position without examining the truth of either statement." *Id*. at 480 (quotation marks and citation omitted). Simply asserting contradictory positions is not enough to invoke the doctrine. *Id*. Rather, and among other elements, there must be some indication that the "court in the earlier proceeding accepted that party's position as true." *Id*. (quotation marks and citation omitted).

We admit that the doctrine does not strictly apply in this case. MDOT has clearly taken contradictory positions, but that is not enough, standing alone, to invoke the doctrine of judicial estoppel. See *id*. It does not appear that this Court accepted as true MDOT's assertion that all of the Moroun entities' challenges could be raised in this condemnation suit. See *Crown Ent, Inc*, unpub op at 1-6 (Docket No. 340039). See also *id*. at 6 n 3 ("Given our resolution of this issue, we decline to address . . . plaintiffs' argument that the Court of Claims erred in holding that it did not have jurisdiction to address challenges to the condemnation proceeding."). Given that MDOT has not presented any clear legal basis to hold that the Moroun entities' arguments are nonjusticiable, we need not rely on judicial estoppel to reject MDOT's argument. But it is worth noting that MDOT was clear and unequivocal when it previously informed this Court that the issues raised in this appeal were appropriate issues to be litigated in a condemnation suit.

Having rejected MDOT's justiciability challenge, we now turn to the substantive issues raised by the Moroun entities.

## B. VALIDITY OF THE CROSSING AGREEMENT IN LIGHT OF 2011 PA 63

The Moroun entities first argue that the entire Crossing Agreement is void because MDOT lacked authority to enter into the agreement when it was executed. Specifically, the Moroun entities contend that the language of Section 384, as enacted by 2011 PA 63, prohibited MDOT from executing the agreement. We disagree.

### 1. STANDARD OF REVIEW

In condemnation proceedings, the trial court's factual findings are reviewed for clear error, and its legal conclusions are reviewed de novo. *City of Novi*, 473 Mich at 249. Questions of statutory interpretation are reviewed de novo on appeal. *City of Riverview*, 270 Mich App at 636.

-18-

## 2. ANALYSIS

The question raised in this issue mainly concerns the interpretation of appropriations bills. Of course, the primary goal in interpreting this language is to ascertain the Legislature's intent. *Spectrum Health Hosp v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 515; 821 NW2d 117 (2012). Generally, the plain language used by the Legislature is the best indicator of its intent. *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). Dictionary definitions are often helpful when the plain meaning of the Legislature's enactment is at issue. *In re Erwin Estate*, 503 Mich 1, 9-10; 921 NW2d 308 (2018). In most cases, the common understanding of a word or phrase is sufficient, but where a word or phrase has acquired a peculiar meaning in the law, it is that more specific understanding that should be consulted. *Id*. It is also important to read words and phrases in context; i.e., one must consider the plain meaning of a word or phrase, but while being aware of the context and purpose of the Legislative enactment. *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009).

Again, in this case, what is at issue are appropriations bills.

In Black's Law Dictionary (4th ed.), p. 131, an appropriation in public law is defined as follows:

'The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense.' [*Boards of Co Rd Comm'rs of Van Buren Counties v Riley*, 50 Mich App 89, 95; 213 NW2d 298 (1973).]

Stated differently, an appropriation "is the setting aside of a specified sum of money in the state treasury to be used for some governmental expenditure, purchase or expense." OAG, 1999, No. 7,022 (June 16, 1999).

In 2011 PA 63, and the following year in 2012 PA 200, Section 384 stated:

(1) The department shall not expend any state transportation revenue for construction planning or construction of the Detroit River International Crossing or a renamed successor. In addition, except as provided in subsection (3), the department shall not commit the state to any new contract related to the construction planning or construction of the Detroit River International Crossing or a renamed successor unless the legislature has enacted specific enabling legislation to allow for the construction of the Detroit River International Crossing or a renamed successor.

There is no dispute that specific enabling legislation was not enacted, and thus, the prohibitions stated in Section 384(1) applied when the Crossing Agreement was executed.

The first sentence of Section 384(1) prohibited MDOT from "expending any state revenue" on the GHIB. The word "expend" is not difficult to understand, particularly considering that it appears in an appropriations bill—the very purpose of which is to control how state funds will be

spent. To "expend" means "to pay out." *Merriam-Webster's Collegiate Dictionary* (11th Ed). And in the context of governmental revenue, "revenue" is "the yield of sources of income (such as taxes) that a political unit (such as a nation or state) collects and receives into the treasury for public use." *Merriam-Webster's Collegiate Dictionary* (11th Ed). The Crossing Agreement is clear, however, in stating that no Michigan funds shall be spent on the GHIB project. Rather, Canada assumed financial responsibility for the project, and any money spent by Michigan is reimbursed by Canada. Thus, and while some Michigan funds might be used momentarily, no Michigan funds are ultimately expended under the Crossing Agreement.[9] Michigan's revenue yield is not affected by the GHIB. We thus conclude that the Crossing Agreement does not run afoul of the first sentence of Section 384(1).

It is the second sentence's prohibition against "committing the state to any new contract for the construction planning or construction" of the GHIB that is more difficult. The Moroun entities read this as prohibiting MDOT from executing any agreement related to the construction or construction planning of the GHIB. MDOT, on the other hand, reads this "boilerplate" language as only prohibiting MDOT from executing a contract that would require Michigan to pay any part of the costs of the GHIB. The question, then, is what it means to "commit the state" to an agreement concerning the "construction planning or construction" of the GHIB.

In the context of a contract, "commit" means to "obligate" or "bind." *Merriam-Webster's Collegiate Dictionary* (11th Ed). And certainly, by executing the Crossing Agreement, MDOT and the other Michigan signatories committed Michigan to the terms of the agreement. But the terms of the Legislative enactments at issue must be read in the context of what they are—appropriations bills. These enactments are, at the core, bills for the appropriation of state funds. With that context in mind, we, like the trial court, read the word "commit" as prohibiting the execution of a contract that would "obligate" state funds.

Reinforcing this conclusion is the structure of Section 384. It is well-established that individual sentences must not be read in isolation; rather, they must be read in the context with the surrounding language. *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010). "[C]ontext matters, and thus statutory provisions are to be read as a whole." *Id*. With that in mind, the first sentence of Section 384—which clearly prohibits the spending of Michigan funds on the GHIB—is important to understanding the meaning of the second sentence. In context, the first sentence is aimed at prohibiting spending Michigan revenue on the GHIB immediately, and the second sentence prohibits obligating the state to spend Michigan revenue on the GHIB in the future. The Crossing Agreement did neither.

Casting further light on the Legislature's intent is Section 384(2). As written in 2011 PA 63, this section created a reporting requirement:

> (2) On or before March 31, 2012, the department shall report to the state budget director, the house and senate appropriations subcommittees on transportation, and the house and senate fiscal agencies on department activities related to the Detroit

---

[9] There is no dispute that Canada has, in fact, fully reimbursed MDOT.

-20-

River International Crossing or a renamed successor. [2011 PA 63, Article XVII, Part 2, Section 384(2).]

This provision clearly contemplates that MDOT would be engaged in some activities concerning the GHIB. The existence of this reporting requirement makes little sense if the Legislature's intent was to prohibit MDOT from engaging in any way with Canada regarding the GHIB. If the Legislature intended to completely prohibit MDOT from forming any sort of agreement concerning the construction or construction planning of the GHIB, there would seem to be very little, if anything, for MDOT to report. Looking at all of Section 384 as it existed when the Crossing Agreement was signed, we conclude that, so long as no Michigan funds were obligated to be spent, the Crossing Agreement did not violate Section 384.

But even presuming there is room to dispute the meaning of Section 384(1) as it existed in 2011 PA 63 and 2012 PA 200, subsequent appropriations bills now explicitly authorize the Crossing Agreement. Beginning in 2013, Section 384 was amended to read as follows:

(1) Except as otherwise provided in subsection (2), the department *shall not obligate the state to expend any state transportation revenue* for construction planning or construction of the Detroit River International Crossing or a renamed successor. In addition, except as provided in subsection (2), the department shall not commit the state to any new contract related to the construction planning or construction of the Detroit River International Crossing or a renamed successor *that would obligate the state to expend any state transportation revenue*. An expenditure for staff resources used in connection with project activities, which expenditure is subject to full and prompt reimbursement from Canada, shall not be considered an expenditure of state transportation revenue. [2013 PA 59, Art XVII, Part 2, § 384(1) (emphasis added).]

This language extinguishes any reasonable dispute regarding whether the Crossing Agreement is valid. While one might argue that the Legislature's choice of words in 2011 and 2012 was not particularly clear, since 2013, our Legislature has been clear about what MDOT is prohibited from doing: expending state transportation revenue on the GHIB. As explained, no state transportation revenue is being expended on the GHIB project because any money that MDOT spends is promptly reimbursed by Canada. Further buttressing this conclusion is the reporting requirement that was stated in 2013 PA 59, Art XVII, Part 2, § 385. That section required MDOT to submit reports to various offices "on department activities related to all nonconstruction or construction planning activities related to the Detroit River International Crossing or a renamed successor." 2013 PA 59, Art XVII, Part 2, § 385(1). This revised reporting requirement shows that the Legislature was fully aware of MDOT's activities related to the GHIB. Rather than prohibit them, the Legislature required MDOT to keep it informed of those activities. As previously explained, the Legislature reenacted these same provisions every year since 2013.

And under the most recent appropriations bill, Section 385 has been amended to simplify the reporting requirements. MDOT is now required to report two categories of information: "All expenditures made by the state related to the Gordie Howe Bridge[,]" and "[a]ll reimbursements made by Canada under section 384(1) of this part to the state for expenditures for staff resources used in connection with project activities." 2019 PA 66, Part 2, § 385(1)(a) and (b). Once again,

rather than limiting MDOT's spending and reimbursement procedure, the Legislature has asked that spending and reimbursements related to the GHIB be reported to various offices. This is, once again, an indication that the Legislature approves of the way that the GHIB project is moving forward, including the way payments for condemned properties are being handled.

Particularly in light of the fact that these legislative statements were made after the Crossing Agreement was signed, one can conclude that the Legislature has affirmatively condoned the Crossing Agreement, including how that agreement is being implemented. The Moroun entities contend that this amounts to the use of legislative silence or acquiescence to interpret the Legislature's words. It is true that the Legislature's silence (generally in the face of judicial decisions) is a disfavored method of statutory interpretation. *McCahan v Brennan*, 492 Mich 730, 749; 822 NW2d 747 (2012). Thus, if the Legislature had merely sat silent after the Crossing Agreement was executed, perhaps one would be correct to argue that such silence should not be construed as approval. But this case does not involve silence. Rather, the Legislature has spoken, and spoken annually, since the Crossing Agreement was executed. Every time, the Legislature has made it clear that it is well aware of the Crossing Agreement. It has altered its prior, somewhat vague prohibitory language into language that condones MDOT's participation in the project so long as no state funds are consumed. And the Legislature has continued to direct that it be kept informed of activities related to the GHIB since the Crossing Agreement was executed. With that, this is not a case of legislative acquiescence. It is a case where the Legislature has condoned MDOT's activities with regard to the GHIB. The Moroun entities' arguments are without merit.[10]

## C. MDOT'S AUTHORITY TO SPEND MONEY TO ACQUIRE PROPERTY

As explained earlier in this opinion, MDOT uses money from the state trunkline fund to pay for the land it condemns for the GHIB. Canada then reimburses MDOT, who places these reimbursement funds back in the state trunkline fund. The Moroun entities argue that this procedure violates MCL 18.1366 and Const 1963, Art 9, § 17 because MDOT is spending money without an appropriation. We disagree.[11]

Pursuant to Const 1963, Art 9, § 17, "No money shall be paid out of the state treasury except in pursuance of appropriations made by law." And pursuant to MCL 18.1366, "Each state agency . . . shall be financed and maintained by specific appropriations by the legislature from the

---

[10] While we do not consider the decision controlling, we note that the Moroun entities also failed to convince the Federal Circuit Court for the District of Columbia that the Crossing Agreement was invalid on this basis. See *Detroit Int'l Bridge Co*, 434 US App DC at 322. And given our resolution of the issue, we decline to consider the constitutional issues raised by MDOT. *J & J Const Co v Bricklayers & Allied Craftsmen, Local 1*, 468 Mich 722, 734; 664 NW2d 728 (2003) ("[Q]uestions of constitutionality should not be decided if the case may be disposed of on other grounds").

[11] As stated previously, to the extent we must interpret a statute, our review is de novo. *City of Riverview*, 270 Mich App at 636. To the extent we must decide any constitutional issues, our review is, likewise, de novo. *Van Buren Twp v Garter Belt Inc*, 258 Mich App 594, 602; 673 NW2d 111 (2003).

operating funds of the state, as such funds may be dedicated by law, pursuant to the submission of the state budget." The Moroun entities argue that there has been no appropriation of money to MDOT to acquire land for the GHIB, and as such, MDOT cannot pay for the property it seeks to acquire in this condemnation action.

Perhaps a threshold issue is whether, given the fact that MDOT is reimbursed by Canada for every penny spent on the GHIB, MDOT is truly spending money such that a legislative appropriation is even necessary. Const 1963, Art 9, § 17 requires that all money "paid out" of the state treasury be done pursuant to an appropriation. Consistent with that constitutional requirement, MCL 18.1366 explains that state agencies must be "financed and maintained by specific appropriations by the legislature from the operating funds of the state, as such funds may be dedicated by law, pursuant to the submission of the state budget." In most ordinary circumstances, it is not difficult to understand what this all means: state funds must generally be spent pursuant to appropriations made by law. But this circumstance is different. Ultimately, money spent by MDOT on acquiring land for the GHIB is fully reimbursed by Canada. In that sense, what is being spent are Canadian funds, not Michigan funds. Where no Michigan funds are ultimately lost, it is not clear whether an appropriation is even required.

Of guidance is *Tiger Stadium Fan Club, Inc v Governor*, 217 Mich App 439; 553 NW2d 7 (1996). In that case,

> The questions presented [were] (1) whether funds generated under a consent judgment entered into by Governor Engler and several Native American tribes in settlement of an action brought under the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq*., and deposited into the Michigan Strategic Fund (MSF) pursuant to the terms of the settlement agreement, are, under the Appropriations Clause, Const 1963, art 9, § 17, and the Separation of Powers Clause, Const 1963, art 3, § 2, subject to the Legislature's power of appropriation, and (2) whether the MSF has the authority to distribute those funds in the form of a grant to the [City of Detroit Downtown Development Authority (DDA)] for use in the construction of a stadium for the Detroit Tigers baseball team. [*Tiger Stadium Fan Club, Inc*, 217 Mich App at 441-442.]

At issue in *Tiger Stadium Fan Club, Inc* was a consent judgment under which several Native American tribes agreed to pay 8% of certain gaming revenues to the MSF, and 2% of gaming revenues to local units of government "in the immediate vicinity of each tribal casino." *Id*. at 443. The parties agreed that it was "of no consequence that the funds were never placed in the state treasury or that they were remitted directly to a public corporation. The location of the funds is irrelevant; *the question is whether the character of the funds and the manner in which they were obtained makes them state funds subject to the Appropriations Clause*." *Id*. at 447-448 (emphasis added.) This Court explained:

> In the instant case, the revenues are generated by the tribes. The revenues are not paid as a tax or a fee, or pursuant to a legislative act. While the revenues are paid to a public corporation as a result of the Governor's negotiation of a settlement of the federal litigation, the mere act of settling a lawsuit involving the state's obligation to negotiate does not automatically render the revenues subject to appropriation; *the character of the revenues must still be considered*. While a

-23-

lawsuit was involved, the state did not concede or give away anything in the settlement of the suit. The revenues at issue do not result from the sale, relinquishment, waste, or damage of state assets. They are not paid as rents or royalties collected for the extraction of nonrenewable resources from state-owned lands. MCL 324.1902; MSA 13A.1902; Const 1963, art 9, § 35. The revenues are not designated as a gift or grant to the state. MCL 21.161; MSA 3.671. The revenues are not received as payment of debts or as penalties. MCL 14.33; MSA 3.186. [*Tiger Stadium Fan Club, Inc*, 217 Mich App at 449-450 (emphasis added).]

This Court went on to explain that in negotiating the settlement, "the Governor identified an opportunity to secure revenues to which the state was not entitled, except by virtue of the negotiated settlement, when he entered in to an agreement that provided for the gratuitous payment of eight percent of certain gaming revenues to the MSF as long as the tribes' right to conduct these activities remains exclusive." *Id*. at 451. "The state gave nothing in exchange for the payments. The tribes' ability to conduct the gaming activities is a matter of right, not grace." *Id*. As this Court explained:

> We thus conclude that the revenues involved are public funds not subject to appropriation. The Governor's negotiation of the settlement agreement providing for payments to the MSF is akin to his procuring a grant of federal or corporate funds for a specific purpose. In such circumstances, the Governor, acting as a representative of the state, convinces the grant-making authority that it is in its best interest to donate funds to the state for a particular purpose. That the Governor might have sought the funds for a different or broader purpose is of no moment. The terms of the grant or gift control. . . . The state gave up nothing; the tribes perceived that it was in their interest to make, in effect, a continuing grant of eight percent of certain revenues as long as the advantageous status quo—exclusive rights to conduct certain gaming activities—is maintained. The negotiated settlement agreement provides for the payment of those revenues to a fund that is authorized to disburse funds to promote economic development throughout the state, including in areas that might themselves be interested in seeing certain local gaming activity, perhaps persuading the citizens and leaders of those areas that there are benefits to be gained from leaving the exclusive right to conduct this gaming activity with the tribes. In short, the payments were not procured by the Governor in exchange for concessions. Rather, they are the tribes' contribution to the MSF to create an incentive to preserve the status quo. The Legislature and the Governor, however, are in no way obligated to preserve the status quo. [*Id*. at 452-453.]

MDOT argues that the present matter similarly involves what are essentially gratuitous payments by Canada. The comparison is by no means perfect. In *Tiger Stadium Fan Club, Inc*, this Court emphasized that Michigan gave up nothing for the payments, and that the tribes' contributions only incentivized Michigan to maintain the status quo. *Id*. With respect to the GHIB, clearly, the status quo is not being maintained; a brand-new international crossing is to be constructed. But on the other hand, prior to execution of the Crossing Agreement, Canada was in

no way obligated to pay for the construction of an international bridge. One could thus view the matter as involving a gift from Canada, at least to an extent.

But beyond that, ultimately, the focus must be on the character of the revenues. *Id*. at 449. When one looks at the whole picture, one thing is clear: Canada is paying for the bridge. More specifically, through the reimbursement procedure, Canada bears full responsibility for the costs of land acquisition in Michigan. In that sense, it is not Michigan funds that are spent, but rather, Canadian funds that are being spent on land acquisition. Certainly, no provision of Michigan's constitution, nor any Michigan statute, would require a legislative appropriation before Canadian funds are spent. As was the case in *Tiger Stadium Fan Club, Inc*, the revenues at issue are not generated through taxes, fees, or legislative act. *Id*. at 449. Rather, the revenues come from Canada. Again, "the character of the revenues must still be considered." *Id*. Canadian funds are simply not subject to appropriation by Michigan's Legislature. As such, no appropriation is necessary under the unique circumstances of this case.

The question then becomes whether the Legislature has nonetheless prohibited MDOT from using money to purchase land. This appears to be the crux of the Moroun entities' argument. The Moroun entities contend that through 2011 PA 63 and subsequent appropriations bills, the Legislature prohibited MDOT from spending any money on the GHIB project, save for money spent on "staff resources" that are fully reimbursed by Canada. This argument lacks merit. Since 2013, the appropriations bills have prohibited MDOT from "obligat[ing] the state to expend any state transportation revenue" on the GHIB project. See, e.g., 2013 PA 59, Art XVII, Part 2, §384(1). But because all funds used by MDOT to acquire land are reimbursed by Canada, no state transportation revenue is being expended. Rather, Canadian funds are ultimately being used to acquire Michigan land. Thus, the Legislature's prohibition has not been violated.

The Moroun entities argue that this would render the sentence concerning staff expenditures surplusage. See, e.g., 2013 PA 59, Art XVII, Part 2, §384(1). It is true that this Court should, when possible, avoid construing a statute in such a way that would render any part of the statute surplusage. *Benedict v Dep't of Treasury*, 236 Mich App 559, 567; 601 NW2d 151 (1999). But interpreting Section 384(1) as generally allowing expenditures on the GHIB does not render this sentence concerning staff resources surplusage. As MDOT argues, the Legislature may simply have wanted to make clear that a particular category of expenses that are initially paid by MDOT shall not be deemed expenditures of state transportation revenue (such that they would require an appropriation) so long as those expenditures are reimbursed by Canada. The language is not limiting; it does not purport to state (as the Moroun entities believe) that this, and only this category of expenditures is permitted. Nor would that make much sense. If, as the Moroun entities argue, "staff resources" are limited to the payment of salaries, wages, employee benefits, and the like,[12] the Legislature would in effect be authorizing the use of MDOT's staff for a project that cannot be consummated. Just as statutory language should not be interpreted in a way so as to render any portion nugatory, this Court must also avoid interpreting such language in an absurd or illogical way. *Benedict*, 236 Mich App at 567.

---

[12] As will be explained, the term "staff resources" is not defined, and it is not at all clear that the term must be limited in the way the Moroun entities argue it should.

Nor is it at all clear that funds spent on land acquisition do not fall within the concept of "staff resources." Section 384(1) has, since 2013, stated, "An expenditure for staff resources used in connection with project activities, which expenditure is subject to full and prompt reimbursement from Canada, shall not be considered an expenditure of state transportation revenue." See 2013 PA 59; 2014 PA 252; 2015 PA 84; 2016 PA 268; 2017 PA 107; 2018 PA 207; and 2019 PA 66. According to the Moroun entities, "staff resources" are only staff expenses; i.e., wages, employee benefits, travel costs, and the like. This appears to come from the fact that until recently, Section 385(2)(a) and (b) required MDOT to report certain costs, "including employee salaries, wages, benefits, travel, and contractual services, and what activities those costs were related to." See, e.g., 2018 PA 207. But the provisions do not purport to define "staff resources," and in fact, later in the reporting requirements, MDOT is required to report "reimbursements made by Canada . . . for expenditures for staff resources used in connection with project activities." Section 385(2)(d), as enacted by 2018 PA 207. If the Legislature understood the term "staff resources" to include only "salaries, wages, benefits, travel, and contractual services," its use of these different terms in the same section would be redundant. Rather, the use of different terms would imply that they mean different things. *United States Fidelity & Guaranty Co v Mich Catastrophic Claims Assoc*, 484 Mich 1, 14; 795 NW2d 101 (2009). Even if one accepts that MDOT may only expend money on the GHIB for "staff resources," the Moroun entities have not made a persuasive argument that "staff resources" would not encompass land acquisition costs.

Finally, it is hard to ignore that, since 2013, the Legislature has continually enacted the same language in Sections 384 and 385. That language clearly shows that the Legislature is fully aware of the GHIB. And through the reporting requirements of Section 385, MDOT has kept the Legislature fully apprised of the fact that it has been acquiring property for the project, and that MDOT is being reimbursed for those expenditures by Canada. Rather than enact any prohibition against this procedure, the Legislature has reenacted the same appropriations language every year. This pattern shows that the Legislature approves of MDOT's activities, including the procedures for acquiring land. While the Moroun entities (and amici curiae) characterize this type of analysis as the use of legislative acquiescence, we disagree. This is simply not a case where the Legislature has sat silent in the face of a judicial decision. Rather, the Legislature has annually enacted appropriations language that demonstrates awareness and approval of MDOT's activities.

Ultimately, no appropriation is necessary because what is being spent is Canadian revenue, not Michigan revenue. The appropriations language relied on by the Moroun entities does not prohibit MDOT from purchasing land where MDOT is fully reimbursed by Canada for those expenses. The Legislature has permitted this procedure. As such, the Moroun entities fail to demonstrate any reason to question the validity of the condemnations.

D.  USE OF THE STATE TRUNKLINE FUND

The Moroun entities next argue that the reimbursement procedure discussed in the prior issue is illegal because MDOT is using the state trunkline fund to spend money and receive reimbursement proceeds from Canada. We disagree.

We question whether this is a relevant challenge to the condemnations at issue. As explained in Section II(A) of this opinion, we are not persuaded by MDOT's justiciability challenge. But as explained in that section of this opinion, MCL 213.56 would seem to

contemplate two types of challenges that may be raised: challenges to the determination of necessity and challenges to the validity of the condemnation. The Moroun entities seem to claim that if any aspect of the Crossing Agreement or its implementation is invalid, the entire GHIB project is invalid. According to the Moroun entities, if the entire project is invalid and cannot go forward, then the condemnation is illegal and invalid.

We would tend to agree that if the entire project is invalid, the takings are unnecessary. Thus, a challenge that, if successful, would invalidate the entire GHIB project would seem to be a proper one to raise in a condemnation suit. For example, the challenge to the validity of the Crossing Agreement is a proper one to raise in this condemnation suit. Similarly, we believe that the challenge raised in the prior issue is properly raised in a condemnation suit. Just compensation is an integral part of the condemnation power; without paying just compensation, land cannot be condemned. Const 1963, Art 10, § 2. Thus, the challenge discussed in Section II(C) above—which challenges MDOT's ability to pay just compensation—is appropriately raised in this condemnation suit.

But the present challenge is different. Even if one assumes that the procedures being used to move money from Canada to MDOT are improper, we doubt that would render the entire project invalid. Perhaps MDOT would need to come up with a different way to move money about, but it would seem that the project could go on. So long as the project can move forward, the taking would remain necessary, and the condemnations valid. In other words, we do not believe that this challenge ultimately has relevance to the condemnation suit.

And on the merits, we are not persuaded that the reimbursement procedure is illegal. The Moroun entities first assert that placing Canadian reimbursement funds into the state trunkline fund violates MCL 18.1443, which provides, "Except as otherwise provided by laws, all money received by the various state agencies for whom appropriations are made by a budget act shall be forwarded to the State Treasurer and credited to the state general fund." MDOT and the trial court agree that the key language is, "Except as otherwise provided by laws . . . ." MCL 18.1443. MDOT argues, and the trial court concluded, that Sections 384 and 385 operate as just such an exception—one which allows reimbursement proceeds to go directly to MDOT and not into the general fund.

We agree with MDOT and the trial court. As has been discussed before, the Legislature has, through Sections 384 and 385, authorized MDOT to spend money on the GHIB so long as that money is reimbursed by Canada. Nothing in the appropriations language indicates that reimbursement proceeds should go to the general fund. Rather, all indications are that reimbursement proceeds would go to MDOT. That, in essence, is the point: so long as MDOT's bottom line remains the same, it may go forward with the GHIB. The reimbursement process crafted by MDOT and Canada ensures that no state transportation revenue is expended for the GHIB—exactly as contemplated by Sections 384 and 385.

The Legislature has been aware of this process for years, but has not made any changes to the appropriations language stating that reimbursement proceeds should be placed in the general fund. The Moroun entities and amici curiae argue that this Court should not use legislative silence to interpret the Legislature's intent. But we again point out that the Legislature has not been silent. It has spoken every year, and its words, as found in the various appropriations bills, have condoned

MDOT's activities, including the fact that it is reimbursed by Canada for every penny that is spent by MDOT. Accordingly, there is no violation of MCL 18.1443, as another law authorizes MDOT to place reimbursement proceeds from Canada into the state trunk line fund and not the general fund.[13]

## E. CANADA'S COLLECTION OF TOLLS

The Moroun entities contend that the Crossing Agreement is illegal because it permits the collection of tolls by Canada. Specifically, the Moroun entities argue that MDOT lacks any statutory authority to agree to build an international toll bridge, as no legislation has authorized MDOT or any other administrative agency to impose tolls on the GHIB. The Moroun entities also argue that the tolling arrangement provided by the Crossing Agreement violates the Urban Cooperation Agreement (UCA), MCL 124.501 *et seq*. We disagree.

We first note that the trial court did not believe these arguments were proper necessity challenges because a dispute over the authority to toll did not go to MDOT's authority to condemn. The Moroun entities assert that the trial court was wrong in this regard because the necessity of a taking depends on the legality of the underlying project. According to the Moroun entities, if the tolling provisions of the Crossing Agreement are invalid, the entire agreement fails. This would in turn mean that the whole GHIB project is itself invalid. And if the entire project is invalid and cannot go forward, then the condemnation is illegal.

The Moroun entities make too many assumptions. If the tolling provisions of the agreement are indeed invalid, it is a significant leap to assume that the entire Crossing Agreement, and thus the entire project, are both illegal and void. Even if one assumes that the tolling provisions that currently exist are invalid, the parties to the Crossing Agreement (mainly Canada, as it has assumed financial responsibility for the project) may be able to come up with a different funding mechanism which would allow the GHIB project to move forward. If so, the condemnation action is not invalid and the necessity of the taking still exists. Thus, it is not at all clear that this and other challenges concerning the collection of tolls are proper challenges to be made in this condemnation action. Rather, the Moroun entities appear to be raising collateral challenges to the Crossing Agreement that do not necessarily affect the condemnation itself.

Regardless, we cannot conclude that the tolling provisions of the Crossing Agreement are invalid. The Moroun entities contend that MDOT lacks authority to agree to build an international toll bridge absent approval by the Michigan Legislature. This is because the Michigan Legislature "has never authorized MDOT or any other administrative agency to impose tolls on the GHIB." The Moroun entities have not demonstrated any legal error because tolls are not going to be

---

[13] The Moroun entities also argue that MDOT is in violation of MCL 18.1366 and Const 1963, Art 9, § 17 by "relying on a financing mechanism that depends on funneling Canadian funds to the state trunkline fund, rather than the MDOT [sic] general fund. This is because there is no appropriation for spending money received from Canada." As was discussed in Section II(C), there is no need for an appropriation because, ultimately, Canadian funds are being spent, not Michigan funds.

collected in Michigan or by any Michigan agency. Section X(2) of the Crossing Agreement states that the Crossing Authority—the Canadian entity created specifically to design, construct, and maintain the GHIB—is entitled to collect "Canadian Crossing Tolls for payment of costs . . . ." Section X(3) states that the "Crossing Authority shall provide the means whereby users accessing the International Crossing from Michigan and returning to Michigan without leaving the International Crossing may do so without paying any Canadian Crossing Tolls." Section X(4) states that "No Party may establish or collect tolls, fees or other charges for use of the Michigan Crossing or the Michigan Interchange."

In other words, under the Crossing Agreement, no tolls are to be collected by any Michigan party; tolls will only be collected by Canada. Those tolls will not be collected for use of the Michigan side of the bridge, but for use of the Canadian Crossing—the Canadian portion of the GHIB. Again, what is authorized by the Crossing Agreement is the collection of "Canadian Crossing Tolls" by the Crossing Authority. The Crossing Agreement defines "Canadian Crossing Tolls" as "all tolls, fees or other charges for use of the Canadian Crossing." The Canadian Crossing is defined as "the bridge, plaza and approach *in Canada* included in the International Crossing Alignment, but not including the Windsor-Essex Parkway." (Emphasis added.) While the approval of the Michigan Legislature might be needed for MDOT to collect tolls in Michigan, Canada does not need the approval of the Michigan Legislature to collect tolls in Canada. For that simple reason, the Moroun entities' argument fails.

The Moroun entities argue that the reality of the situation is that if one pays a toll in Canada, he or she is paying for use of the entire bridge, not only the Canadian half. The average traveler may not understand the intricacies of the Crossing Agreement or the reasons it has been crafted that way, but the fact remains that the parties have agreed not to conduct any tolling on the Michigan portion of the bridge. Use of the Michigan side of the bridge (and indeed, the entire bridge, if one never leaves the Canadian Crossing) is free; tolls are only imposed for use of the Canadian portion of the bridge, and those tolls are only collected by Canada.

The Moroun entities argue that the arrangement does not comply with the UCA. Under MCL 124.504, public agencies of this state can exercise jointly with "a public agency of Canada . . . any power, privilege, or authority that the agencies share in common and that each might exercise separately." The Moroun entities argue that MDOT has no authority to toll on the GHIB, and thus, MDOT cannot agree to the joint exercise of tolling authority with Canada, as both parties do not share the same power or authority. The argument lacks merit. Again, only Canada is collecting tolls, and is doing so only on the Canadian portions of the GHIB. There is no joint exercise of powers; there is only the unilateral exercise of power, by Canada, to collect tolls. MCL 124.504 is of no relevance.[14]

---

[14] And again, we note that the Federal Circuit Court for the District of Columbia has taken the same position. See *Detroit Int'l Bridge Co*, 883 F3d at 900 (stating that, with regard to the tolling provisions of the Crossing Agreement and MCL 124.504, "Those powers were granted to the Crossing Authority, which is a Canadian entity not subject to the Urban Cooperation Act's requirement for Michigan agencies.").

The Moroun entities argue that by signing the Crossing Agreement, MDOT has helped create a toll bridge. Further, there will be Michigan representatives on the board that approves toll rates. "MDOT and the other Michigan parties thus are essential participants in the tolling of the GHIB." The Moroun entities stop there, however, and do not explain what relevance that has. Again, only Canada will be exercising any tolling powers. MDOT may be helping to create a bridge that Canada will be able to toll, but that does not mean that MDOT is a participant in that tolling activity. The Moroun entities fail to explain how Michigan's involvement in the GHIB project transforms MDOT into a tolling party.

The Moroun entities argue that even if only Canada is viewed as exercising the power to toll, the UCA is still violated by the execution of the Crossing Agreement. The Moroun entities argue that the circuit court "never attempts to explain where MDOT gets the power to enter into an agreement with Canada that relies on Canada's power to toll, even if it is considered a unilateral exercise of Canadian power." Regardless of what the circuit court did or did not say, the UCA authorizes MDOT's actions. Pursuant to MCL 124.505(1), "a joint exercise of power pursuant to this act shall be made by contract or contracts in the form of an interlocal agreement . . . ." The "joint exercise of power" in this case is the construction of an international bridge. Funding of that bridge, through the collection of tolls, is an aspect of that agreement. Pursuant to MCL 124.505(1)(a), an interlocal agreement may provide for "the manner in which the power will be exercised." There are a number of provisions of MCL 124.505(1) that allow an interlocal agreement to contain provisions regarding funding and allocation of costs. For example, MCL 124.505(1)(f) allows the parties to create a "method or formula for equitably providing for and allocating revenues, including . . . any other form of taxation, assessment, levy, or impost . . . ." Given that Canada is paying for the entire project, it is entirely equitable to give Canada the sole power to toll on the bridge. This is not the joint exercise of power, but rather, part of the manner in which Michigan and Canada will jointly exercise their respective powers to construct a bridge, set forth in the interlocal agreement.

The Moroun entities' argument essentially asks that every term of an interlocal agreement consist of powers that each entity could exercise alone. That makes little sense. For example, in MCL 124.505(1)(j), the UCA states that an interlocal agreement may provide for the "acquisition, ownership, . . . or sale of real or personal property." Certainly, Michigan has no power of its own to sell Canadian land, and vice-versa. Nor would Canada have the authority to acquire Michigan land by condemnation. Thus, under the Moroun entities' arguments, an interlocal agreement could not contain provisions authorizing Michigan to acquire or sell Michigan land because Canada could not exercise that same power, and vice-versa. This all goes to show that the financing mechanism at issue in this case—tolling—must be viewed not as its own "joint exercise" of power, but rather, as a term of an agreement explaining how the parties' joint exercise of power will be conducted. For these reasons, the Moroun entities have not shown that the tolling provisions are illegal.

## F. RESTRICTING THE LEGISLATURE

As will be explained in more detail below, the Crossing Agreement contains provisions that would require Michigan to pay some costs of the GHIB should Michigan's Legislature decide to impose tolls on the bridge in the future. The Moroun entities contend that these provisions are not permitted by the UCA and would tie the hands of the Legislature in the future. We disagree.

Once again, we question whether this is a proper challenge to the condemnation of the Moroun entities' property. It would seem that even if the Moroun entities are correct, this would not undermine the entire GHIB project. At most, one provision of the Crossing Agreement might be invalid, and might require some renegotiation of the agreement. But that would not necessarily undermine the entire GHIB project, and would thus not render the taking unnecessary or the condemnation invalid. Again, this seems to be a collateral challenge that has no real relevance to the condemnation action.

This challenge is even farther afield than some of the prior challenges because it relies on a circumstance that has not, and may never, come to fruition. Ultimately, the question in this case is whether the condemnation is valid *now*. The Moroun entities offer no evidence that Michigan has any intent to impose tolls on the GHIB. Where the Moroun entities' argument concerns a future contingency that may never occur, we question how the issue could be properly raised in this condemnation suit. Presently, the Crossing Agreement prohibits collecting tolls on the Michigan side of the bridge, which is entirely consistent with both MDOT's and the Moroun entities' understanding of the law; all agree that absent legislative authorization, there can be no tolling by MDOT or any other Michigan agency on the Michigan side of the bridge. Thus, as of this moment, there is no legal problem. A problem would only potentially arise if the Legislature decides that it would like to toll on the bridge in the future. That possibility would not seem to undermine the validity of the taking in the present moment.

But regardless, we will address the merits of the argument. And on the merits, the Moroun entities have not demonstrated any legal problem with the Crossing Agreement. The Moroun entities claim that the agreement prohibits the Legislature from imposing a toll in the future. It does not. The Crossing Agreement does state that no party is permitted to "establish or collect tolls, fees or other charges for use of the Michigan Crossing or the Michigan Interchange." That provision simply recognizes that currently, the Michigan Legislature has not authorized tolling on the Michigan portion of the bridge.

As to what may be done in the future, the parties have created provisions planning ahead in the event the Legislature decides to collect tolls. In that event, the parties have agreed that Michigan shall become responsible for half of the costs of the bridge, less revenues that have already been collected by Canada. Further, such tolls would be collected by the WDBA. Again, pursuant to the UCA, an interlocal agreement may contain provisions providing methods for equitably allocating revenues. MCL 124.505(1)(f). That is what the parties to the Crossing Agreement have done. We conclude that the provisions concerning tolling on the Michigan side of the bridge are valid and consistent with MDOT's authority under the UCA.

## G. DOES THE GHIB VIOLATE MCL 252.52?

All agree that the GHIB will be a limited-access highway, and pursuant to MCL 252.52, commercial enterprises are generally banned from limited-access highways (although there are many exceptions). The Moroun entities argue that the GHIB will be a commercial enterprise because it will be "a toll bridge that will be operated by a for-profit private concessionaire requiring drivers to pay tolls in exchange for the right to cross the bridge." We disagree.

As with other tolling-related challenges, we again question the relevance of this particular issue in the context of a condemnation suit. Again, even if the GHIB cannot operate as a toll bridge, that would not necessarily undermine the entire project; some other funding mechanism may be possible, and thus, the taking could still be necessary. But regardless, we address the issue on the merits.

Pursuant to Article II of the Crossing Agreement, titled, "Purpose," the purpose of the Crossing Agreement is:

> . . . to provide a framework for the Crossing Authority established by Canada to, with the assistance as necessary, but not funding by, Michigan:
>
>> (a) design, construct, finance, operate and maintain the International Crossing through the life cycle of the International Crossing and design, construct and finance the Michigan Interchange prior to the International Crossing Opening Date, under the oversight of the International Authority established by this Agreement with three members appointed by Canada and the Crossing Authority and three members appointed by the Michigan Parties, with funding as approved by Canada, through one or more Public-Private Agreements with one or more private sector Concessionaires procured through one or more competitive procurement processes; and
>>
>> (b) design, construct, finance and/or maintain the US Federal Plaza, with the agreement and funding as approved by US Federal Agencies and with any funding as approved by Canada, through one or more US Federal Plaza Public-Private Agreements with one or more private sector Concessionaires procured through one or more competitive procurement processes;
>
> in order to facilitate international trade and the efficient movement of legitimate goods and travelers between Canada and the United States of America; support the economies of Ontario and Canada and Michigan and the United States of America; and benefit the communities in and around Detroit and in and around Windsor.

At her deposition, Linda Hurdle, the Chief Operating Officer of the WDBA, explained that the winning bidder will, in all likelihood, include an amount in their bid that represents the bidder's profit. Along with designing and constructing the bridge, the private concessionaire will also maintain and operate the bridge in the future, and will be paid by Canada for those services as well. As part of the agreement with the concessionaire, the WDBA will continue to pay the concessionaire an agreed-upon amount at regular intervals for "operation, maintenance, as well as

capital repayment." The concessionaire will collect tolls, but will remit the entire amount collected to the WDBA. The concessionaire's profit will not depend on the amount of tolls collected.[15]

We conclude that this is not a "commercial enterprise" prohibited by MCL 252.52(2). The statute does not define a "commercial enterprise." But there are some obvious cues to be taken from the surrounding statutory text. The statute at issue, MCL 252.52(2), provides the following:

> The state transportation department shall allow only the installation of vending machines at selected sites on the limited access highway system to dispense food, drink, and other articles that the state transportation department determines appropriate. The state transportation department shall allow only the installation of vending machines at selected travel information centers. Following a 2-year trial period the state transportation department shall use its discretion with the advice of the commission for the blind to allow only vending machines at other locations on the limited access highway system. The vending machines shall be operated solely by the commission for the blind, which is designated as the state licensing agency under section 2(a)(5) of chapter 638, 49 Stat. 1559, 20 U.S.C. 107a. *Except as otherwise provided in this section, no other commercial enterprise shall be authorized or conducted within or on property acquired for or designated as a limited access highway.* The commission for the blind shall require evidence of liability insurance and monitor compliance as it pertains to only vending machines in the designated areas, holding harmless the state transportation department. [Emphasis added.]

Numerous exceptions to the prohibition against commercial activities on limited-access highways are carved out in the sections that follow, but none specifically exempt tolling on any structure. See MCL 252.52(3)-(11). These include such activities as the operation of facilities "for the sale of only those articles which are for export and consumption outside the United States[]" at the Blue Water Bridge and the International Bridge in Sault Ste. Marie, MCL 252.52(3) and (4), the operation of customs brokering facilities at those locations, MCL 252.52(5), the distribution of free travel-related information at rest areas, MCL 252.52(7), the "installation, operation, and maintenance of commercial or noncommercial electronic devices and related structures . . . [that] are intended to assist in providing travel related information to motorists who subscribe to travel related information services, the public, or the state transportation department[,]" MCL 252.52(9), the "use of logo signage within the right-of-way of limited access highways[,]" MCL 252.52(10), and signs identifying nearby hospitals that provide 24-hour emergency care, MCL 252.52(11).

Looking at MCL 252.52(2), it seems fairly obvious that the types of "commercial enterprises" at issue are generally those that are engaged in the sale or advertising of goods and services. One thing is clear: no exception is made for the alleged "commercial" activity of construction and maintenance of a limited-access highway. The reason for that is obvious. The

---

[15] Since the record was developed and the matter was decided in the trial court, the private concessionaire has been selected.

Legislature has simply not viewed the construction and maintenance of a roadway as a type of "commercial enterprise" that would require an exception under MCL 252.52.

Nor do we view the fact that tolls will be collected on the GHIB as all that important. For one, those tolls will be collected on the Canadian side of the bridge. As was explained previously, those tolls are not collected for use of the entire bridge, but for use of the Canadian portion of the bridge. A Michigan statute prohibiting a commercial enterprise in any particular area would seem entirely irrelevant; Michigan cannot regulate the use of Canadian land. And again, even presuming that MCL 252.52 could be applied in this instance, the Legislature apparently does not view tolling as a commercial activity. No exception is made for tolling under MCL 252.52, despite the fact that other bridges (namely the Blue Water Bridge and International Bridge) collect tolls and would be considered limited-access highways. Beyond that, it is clear that the tolling that will be conducted is not "commercial." Tolls will be collected by the WDBA to pay for the cost of constructing the bridge and its ongoing maintenance. The purpose of building the bridge in the first place is not commercial; i.e., neither Canada nor Michigan intends to operate the bridge as any sort of a business. Rather, it is a governmental function. Cf. *Goodhue v Dep't of Transportation*, 319 Mich App 526; 904 NW2d 203 (2017) (for purposes of MCL 691.1413, the proprietary function exception to governmental immunity, operation of the Blue Water Bridge, which is funded primarily by tolls, was not a proprietary function; tolls were collected so that the bridge could be operated on a self-sustaining basis). While this case does not involve the proprietary function exception to governmental immunity, the underlying theme is the same: collecting tolls to pay for the construction and maintenance of a public bridge does not transform that bridge into a commercial enterprise.

Affirmed.


/s/ Mark J. Cavanagh
/s/ Michael J. Kelly



Stephens, J. did not participate because she recused herself to avoid the appearance of impropriety. During oral argument both attorneys quoted from an opinion she had issued as judge of the Court of Claims involving some of the parties to the instant case on an issue before the court in this appeal. Neither party had cited the Court of Claims opinion in their briefs.